Lewis O. KERWOOD, Plaintiff,

v.

MORTGAGE BANKERS ASSOCIATION OF AMERICA, INC., Defendant.

Civ. A. No. 79–0889.

United States District Court, District of Columbia.

June 24, 1980.

MacKenzie Canter, III, Washington, D. C., for plaintiff.

John E. Vanderstar, Washington, D. C., for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Plaintiff, Lewis O. Kerwood, was dismissed from his position as senior director of the education and training department of the defendant, Mortgage Bankers Association of America, Inc. (MBA), on August 22, 1978; at the time, he was 61 years of age. He has brought this suit alleging that his dismissal constituted unlawful age discrimination under the Federal Age Discrimination In Employment Act (ADEA), 29 U.S.C. § 621, et seq., as amended. Defendant, denying this assertion, contends that the plaintiff's termination was based entirely on factors unrelated to his age.

Created in 1967 for the express purpose of promoting "employment of older persons based on their ability rather than age" and prohibiting "arbitrary age discrimination in employment,"[1] the ADEA, energized by its 1978 amendments[2] envelops all manner of prohibition against such diverse employment practices as failure to hire, discharge, denial of employment opportunities[3] and discrimination due to age concerning conditions of employment.

Courts agree this remedial, humanitarian legislation must be liberally construed to effectuate the congressional mandate of ending age discrimination in employment. Gabriele v. Chrysler Corp., 573 F.2d 949 (6th Cir. 1978); Dartt v. Shell Oil Co., 539 F.2d 1256 (10th Cir. 1976), aff'd, 434 U.S. 99, 98 S.Ct. 600, 54 L.Ed.2d 270 rehearing den., 434 U.S. 1042, 98 S.Ct. 785, 54 L.Ed.2d 792. Those subtleties inextricably woven through any form of prejudice particularly interline the creases of age where victims of discrimination, actual or apparent, represent the more vulnerable, sensitive members of our society.

The Court then is especially wary of the nuances of action and word and discerns whether, overt expression to the contrary, they in fact signify any form of age discrimination. In this climate each case, supported by its own underpinnings, must be scrubbed clean of the fog of discriminatory obfuscation creeping in "on little cat feet"[4] in the guise of economic priority.

Did age then, impermissibly, play either any factor, or the determining factor, in plaintiff's dismissal from employment? Did

---

1. 29 U.S.C. § 621(b).

2. Pub.L. 95–256, 92 Stat. 189, made major revisions to the 1967 ADEA, among them raising the protected age bracket applicable to the private sector and to state and local governments from 65 to 70 effective January 1, 1979, and in large part removing entirely the upper age limit for federal employees effective September 30, 1978.

3. 29 U.S.C. § 623(a)(1): It shall be unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

4. Fog [1916] Carl Sandburg
 The fog comes
 on little cat feet.
 It sits looking
 over the harbor and city
 on silent haunches
 and then moves on.

the defendant design to replace its "over-40" employees with younger ones; for the purpose of reducing its salary and pension cases? Or, was the termination of plaintiff the result of his unsatisfactory performance and therefore fully appropriate within the exercise of reasoned business judgment?

The defendant corporation is a national trade association in the mortgage banking field, organized and existing under the laws of the State of Illinois, with its principal offices in the District of Columbia. Its membership exceeds 1900 companies.

Plaintiff commenced his employment with MBA in 1954 as its Director of Education and Research and sole member of this department. He was one of nine employees on the entire staff of MBA. The only educational activity then existing included one seminar, one textbook, and one economic retreat. At the time plaintiff left the defendant's employment in 1978, the MBA staff had become a highly departmentalized staff of approximately eighty employees with 16 people in plaintiff's department. During these twenty-four years plaintiff received substantial yearly increments to his salary which, at the time of his dismissal, was $48,000 annually.

As the senior director of his department, Mr. Kerwood had the principal responsibility for the development and overall management of an expanding and widely respected educational program. An illustrative, but not an exhaustive description of his duties, would include direction of the Senior Executives Conference,[5] the enlargement of the one predecessor seminar to a school of mortgage banking,[6] the continuing activities of the certified mortgage bankers program, the income property case study program, and the correspondence courses.[7]

It is plaintiff's contention that he was performing his duties in a highly satisfactory manner when a new, young, energetic executive vice president, Dr. Mark J. Riedy, joined MBA and determined, in part, plaintiff asserts, to achieve pension and salary economies by eliminating "older" employees (essentially, those 50 or more years of age).

The parties' positions can be more readily appreciated in consideration of the administrative structure of MBA. Its functions are conducted by a Board of Governors, consisting of approximately 90 presidents or other senior officers of member companies who are elected from the general membership and serve without pay. It is the policy-making body of the organization, with four elected officers: president, first vice-president, second vice-president, and treasurer. A person elected second vice-president normally progresses upward in succeeding years and becomes president for one year. The president (and the other officers to a lesser degree) have a substantial day-to-day involvement with the activities of MBA. An Executive Committee, comprised of the officers, the immediate past president, and seven other members appointed from the Board, makes decisions between Board meetings. Many other committees are chosen from the Board membership; these deal with administrative and housekeeping matters as well as substantive program matters.

MBA's staff is directed by an executive vice president, who is the most senior employee and the only paid officer. As MBA's chief administrative officer, he has full authority to employ and dismiss all other employees.

5. This annual executive retreat for the foremost policy makers of the various company-members was programmed by New York University when plaintiff commenced employment with MBA. Thereafter, plaintiff directed it as ". . . essentially it became [MBA's] program in cooperation with New York University."

6. Plaintiff designed the curriculum, selected the students (ranging 700–900 in its high growth period), recruited the faculty members, and made arrangements with several universities to present the same three courses, one basic, two advanced. The home study program and final examinations were among plaintiff's considerable contributions.

7. In 1960 Mr. Kerwood inaugurated a correspondence course program for which he wrote the first course; since, nine additional courses have been added.

Dr. Oliver H. Jones, a nationally renowned economist and authority on real estate finance, served MBA as its executive vice president from 1968 to 1977; prior to this period he was defendant's research director.

During Dr. Jones' tenure as executive vice president, the MBA staff was frequently criticized by the members and officers for its lack of coordination and organization attributed to autonomism exercised by the department heads and other personnel, each operating independently of the others, thereby impairing the effectiveness of the overall operation. Plaintiff, a longtime associate and personal friend of Dr. Jones, was singled out as the prime example of a department head who operated his department as his own "fiefdom."

Dr. Jones and the Board had pronounced differences of administrative approach reflected primarily in Board actions of 1976 and 1977. There was a concern, *inter alia*, that the staff and plaintiff's department in particular were insufficiently responsive to the needs of the "income property" segments of the membership;[8] confronted by the life insurance companies' threatened mass resignation revolt from MBA, and over Dr. Jones' protest, the Board forced establishment of a separate income property component within an existing MBA department.

When membership dues substantially increased in 1977, Dr. Jones was directed to institute appropriate revisions in MBA's method of budgeting its annual expenses and to allocate the overhead budget over all the operating departments pursuant to their contributions to overall profit. The Board discussed this proposed change with each department head; each was cooperative save for the plaintiff and Robert Gray (head of the public relations department) who demonstrated their distaste for the proposal. Kenneth Rothschild, 1976–1977 President of MBA, recalls Mr. Gray's presentation as a "fanciful absurdity;" although he had limited contact with plaintiff, he was negatively impressed with Mr. Kerwood's actions over a period of one year's discussion about the matter, recalling his "obnoxious, noncooperative manner."

In the spring of 1977, Dr. Jones could not be dissuaded from submitting his resignation effective October 31, 1977. He predicted the following years would produce a group of officers who were "managers," whose business administration style Dr. Jones could not accept.

During this interim period the functional direction of the staff was conducted by Peter M. Williams, previous head of MBA's management services department.

The Board established a search committee to locate Dr. Jones' replacement. Although many factors entered the quotient, including technical knowledge of real estate finance, the essential qualities required were strong management and able coordination skills. Sex and age were not considerations.

The search process led to the selection of Dr. Riedy as the new executive vice-president. He was the Board's sole nominee for this position, then 36 years old with impressive credentials. After receiving his doctorate in business economics he served with the Council of Economic Advisors, as special assistant to the Chairman of the Federal Home Loan Bank Board, and as vice-president and director of research of a private mortgage insurance company. At the time he was selected to head the MBA staff, Dr. Riedy was chief economist of the Federal Home Loan Bank in San Francisco. Those involved in the process were confident that their search had produced the administrative and managerial skills MBA needed.

Although Dr. Riedy was hired in October, 1977, he did not actually assume the helm in Washington, D. C. until January, 1978. In the three months preparation for the actual undertaking, Dr. Riedy had discussions with several hundred MBA members around the

---

8. These constituted members whose investments were primarily in income-producing property rather than, single-family homes.

country, including committee chairmen, officers, and others who could provide him with substantive information about the operation of the staff. John C. Opperman, impending president of MBA, and also chairman of a mortgage company headquartered in San Francisco, had frequent opportunity to share MBA's staff and other internal administration problems with Dr. Riedy, focusing on specific areas of performance of the departments and their staffs.

Two major problems were highlighted, one relating to plaintiff, the other to the pubic relations department directed by Robert L. Gray,[9] age 58. As a consequence of Dr. Riedy's reliance on public relations, his evaluation of the public relations materials prepared by Mr. Gray's department, his discussion of MBA's press image with members of the financial community press, and his conclusion as to the total inadequacy of the public relations enterprise [all determined between October 1977 and early January, 1978], Dr. Riedy requested Mr. Gray's resignation on January 9, his very date of assuming office, with salary (severance pay) extended through April 30. Although Gray's request to make the resignation effective May 1 was promptly refused, thereby precluding this employee from the benefit of an additional pension plan contribution of several thousand dollars, it must be recognized that MBA then had no severance pay policy for terminated employees; under later adopted procedures Mr. Gray would have received only six weeks' termination pay as contrasted with the approximately three and one-half months compensation he did secure.

Although Mr. Gray asserted that his age was a factor in his dismissal, he provided no viable factors or even inferences through his testimony for the court to concur. Indeed he admitted that a new chief administrative officer of the organization would want a good relationship with the public relations director, that style and image were important components of his department and that he "did not get along" with Williams, the caretaker-executive vice-president during the months preceding Riedy's arrival. Dr. Riedy has denied that age was a factor in Mr. Gray's employment termination. It would have obviously been less shattering to Mr. Gray had he been afforded some period of time to attempt adaptation to Dr. Riedy's wishes, but, although unusually brusque and clearly ungenerous as to timing and opportunity, this calculated business judgment could not be construed as unlawful discrimination.

Through the above action, and others, Dr. Riedy immediately inaugurated his management techniques upon arrival at MBA's office on January 9, 1978. A management committee was established composed of each department head and other senior staff individuals who reported to him. To broaden and diffuse the knowledge each staff person had about other phases of MBA's operation, those committee members would meet weekly to exchange information about the departmental activities. The department heads were asked to provide Dr. Riedy with an organization chart, a series of job descriptions, and a comprehensive review of that department's functions.

The second paramount problem on which Dr. Riedy had focused during the months prior to his arrival in the District of Columbia concerned the plaintiff's education department. He decided then to wait "and bring him [Kerwood] around to my way of doing." Within a week of his assumption of office Dr. Riedy advised Kerwood that his independent and too autonomous operation had to cease in the interests of team activity.

Throughout his tenure, plaintiff had maintained a firm hold on all aspects of the

---

**9.** *See Gray v. Mortgage Bankers Association of America, Inc.,* 492 F.Supp. 914 (1979), in which Mr. Gray alleges age discrimination. Although the discussion herein cannot resolve the merits of that action, it is appropriate to observe that the plaintiff in *Kerwood* placed the *Gray* matter in issue when Mr. Gray appeared as a witness to allege, but not to prove, that defendant acted discriminatorily towards him or that defendant had a pattern of age discrimination practices.

education department. He worked well with the executive vice-presidents who preceded Dr. Riedy, primarily because their management styles permitted plaintiff a great deal of latitude in directing his department. Although Mr. Kerwood challenges the assertion that he operated his department as a personal "fiefdom," it was he who vividly illustrated the dimensions of that characterization when he lauded Dr. Jones who

> didn't interfere and let's put it bluntly, he let me do my job . . . I don't think once in all the time he was executive vice-president he ever really confronted me with a professional problem, meaning an educational, procedural problem", Kerwood Deposition, 129–130.

In his twenty-four years at MBA, Mr. Kerwood created and expanded the excellent educational program at 111 operated by his department in early 1978. Appropriately, defendant offers only the barest criticism of the educational function of the plaintiff's department; there is no contention that plaintiff's professional qualities were wanting in any material respect. On the contrary, MBA's positive assessment of plaintiff's contribution in this regard is bolstered by a host of impressive testimony from witnesses coming substantial distances to offer testimony on plaintiff's behalf as to his competence, innovations, and successes. It is, however, in the area of management and administration, which MBA equated with technical skills, that plaintiff's deficiencies were most striking.

Since Mr. Kerwood viewed the MBA education department activities as his personal responsibility, unnecessary to share with others, he told Riedy he had effectively "run his own shop" for 20–24 years. Although he recognized the new executive vice-president's insistence on coordination and briefing, he nonetheless resisted full implementation of these directives, giving only token obeisance to his new superior's management style, which plaintiff challenged as "time consuming, inefficient [and, candidly] an impediment" to plaintiff's activities. Frequently the policy purpose would be thwarted in subtle, obstructive ways. A few examples, of the numerous detailed at trial, suffice to illustrate the persistent, sometimes hidden resistance to new management.

When Dr. Riedy requested briefings on a major educational program, Mr. Kerwood sent him a 12–inch stack of looseleaf course material notebooks rather than a digested, highlighted explanation.

For efficiency's sake, Dr. Riedy established a system under which staff members were to make appointments to discuss various matters; where written materials were to be discussed, these were forwarded in advance for Dr. Riedy's study preliminary to the conference. Plaintiff would not follow this approach, insisting on seeing Dr. Riedy without an appointment and attempting to discuss written materials without sending them beforehand, thereby lessening efficiency and negating Dr. Riedy's opportunity to be fully briefed when he received the matter.

Plaintiff was appreciably delayed in preparing some seminars and conferences sponsored by his department and particularly late in selecting participants for the Spring 1978 Income Property Finance Conference. When he left town without adequate instructions to his assistant director, it was Dr. Riedy who had to make extensive revisions and finalize the program in plaintiff's absence, a matter subsequently objected to by plaintiff as "interference" in "his" program.

Another example of plaintiff's failure to integrate his department into the overall MBA operation related to the Senior Executives Conference, an economic outlook forum held annually under Mr. Kerwood's personal direction. When Dr. Riedy instructed plaintiff to permit the new chief economist to have more input than his predecessor in the planning of the Conference, he specifically noted that principal responsibility was to remain in the education department. In direct defiance of this instruction, plaintiff sought to transfer all responsibility for conducting the Conference to the new chief economist.

The relationship between Dr. Riedy and plaintiff constantly deteriorated. The mutual discontent was not veiled. During January—August 1978 a number of extended "heart-to-heart" conversations occurred between the principals but failed to resolve the abyss. Mr. Kerwood would assure Dr. Riedy that he "would do the best I could" to adapt to the requirements. Dr. Riedy detailed his specific dissatisfactions urging plaintiff to change: "I would tell Lew what I wanted but Lew did not seem to understand."

As defendant positions it, "the principal problem with plaintiff's performance was his persistent refusal to cooperate with the executive vice-president in his attempt to improve the coordination and communication among the staff."

Viewed singly, the above may appear insubstantial, even petty criticism. But as the instances multiplied, month following month, in endless fashion, considered conjunctively with other examples of fractionated cooperation to the "new broom's sweep," the coupled aggravations exacerbated and constantly revisited knowledge of prior difficulties. Were this continuing impasse to be construed as obstreperous recalcitrance, termination would be unquestioned. When these differences are considered more reasonably, as opposing management philosophies, with the subordinate unable to mesh his independent spirit elasticized over twenty-four years to a team concept of his administrative superior demanding conformity *now*, then termination is inevitable and only a question of timing.

As a result of the problems he had with plaintiff's performance, Dr. Riedy decided in June, 1978, without budget committee objection, against increasing plaintiff's salary for the upcoming year. All other staff members were slated for salary increases.

On August 21, 1978, Dr. Riedy met with Mr. Kerwood to discuss again his failure to adapt to the system of management. Plaintiff remonstrated that he had been fully cooperative and had complied with all directives. Aware of deterioration in the mutual understanding and convinced of no

alternative, Dr. Riedy informed plaintiff on August 22, 1978 that, because of his failure to respond to the new, mandatory management principles, he could no longer remain on the staff of MBA. Three choices were offered: (1) to resign, (2) to retire, or (3) to be dismissed. Dr. Riedy specifically urged that plaintiff "go out in style," with a retirement dinner and similar accouterments. When Mr. Kerwood was unable to make that decision, Dr. Riedy dismissed him, effective immediately, reserving to plaintiff the choice, never subsequently exercised, to have the dismissal changed to a resignation or retirement.

Dr. Riedy determined to grant plaintiff, in the absence of a fixed termination policy, a severance allowance equal to six months salary ($24,000) and accrued vacation pay of $9,276.92. Had MBA's current severance policy been in effect at the time of plaintiff's dismissal, he would have only been entitled to a maximum payment of some 13 weeks salary ($12,000) and vacation pay. Plaintiff was also entitled to one of the following pension benefits: (1) $1,055.32 monthly commencing immediately upon termination, (2) a monthly sum of $1,413.05 commencing at age 65 or (3) a lump sum payment of $138,138.64. Plaintiff exercised none of these options.

Dr. Riedy's decision to terminate Mr. Kerwood met with approval by MBA's then president and in September 1978 the Board of Governors learned the details of this decision, which was unanimously supported by the executive committee. None of the Board members suggested that Dr. Riedy's decision should be overturned, although several objected to the manner in which termination was accomplished, proposing that plaintiff's severance pay should be increased in light of his many years of service. The officers were authorized to review the severance arrangement and thereafter decided that plaintiff should receive a year's salary in lieu of six months. Accordingly, plaintiff received $48,000 (less withholding), in addition to $9,276.92 in vacation pay, and was entitled to the pension benefits above noted.

Several members discussed trying to secure reversal of the decision to dismiss Mr. Kerwood. The matter was presented to the Board which did not take any action.

Upon plaintiff's dismissal, Dr. Riedy assumed the duties of director of the education department, pending selection of a successor.

The vacancy was advertised; more than 300 applicants submitted resumes. The median age of those listed was 41; only 8 were over 55. All applications were initially screened by MBA's personnel director, and then forwarded to Dr. Riedy. Of 60–70 initial candidates for consideration nine "finalists" were selected, ranging in age from 34 to 58.

The position, offered to one in his early forties who rejected the offer, was accepted subsequently by a 58 year old business school dean of a local university who commenced his MBA employment in February 1979.

There is no evidentiary basis for plaintiff's contention that this person was hired solely to provide a defense to this lawsuit.

In part, plaintiff has based his claim of age discrimination on the fact that several older staff members were dismissed or directed to resign by Dr. Riedy and that their replacements were younger. He contends that by this turnover that MBA realized substantial economic savings in pensions and salaries.

In addition to Mr. Kerwood and Robert Gray (above discussed) plaintiff proffered the situations of four other such employees who were discharged: Mssrs. Williams, Wetmore, Hart, and Herron. The latter three testified in this action; several witnesses referred to Mr. Williams' situation.

Peter M. Williams, age 51, had served as interim chief of operations since the spring of 1977, when Dr. Jones announced his impending resignation, and then as chief of staff between Jones' actual resignation in October and Dr. Riedy's arrival in January 1978. He had had no assurance he would have an official position upon the appointment of the new executive vice-president. His former position as head of the management service department had been replaced one-half year earlier. Accordingly, Mr. Williams was placed in a new position as director of administration but his interpersonal relations with the staff were so ineffective that despite his brilliance no one questioned the justification of his demanded resignation.

John Wetmore, senior director of the economics and research department, was 52 at time of severance from MBA. Dr. Riedy, also an economist, notified Mr. Wetmore of his intention to rely on the Wetmore economics department for policy advice. Dr. Riedy instituted operational changes in that department, creating the title of supervisory statistician, demanding prompt replacements for the existing vacancies, insisting that salaries be increased, and assuming responsibility himself to clear these budget increases with the Board. In early March Dr. Riedy advised Mr. Wetmore of his dissatisfaction with implementation of the administrative changes, including lack of compliance with the directive to hold staff meetings for the dispersion of information about this and other departmental operations. Mr. Wetmore felt he was complying to the best of his ability but was constrained by time limitations. Without prompt, demonstrated change Mr. Wetmore knew discharge was imminent; he was terminated in late March 1978. Dr. Riedy offered to let him remain in his present position on the staff until May [although he would receive benefits through July] to provide Mr. Wetmore an improved opportunity to locate other employment.

Since Wetmore remained on payroll status beyond April 30 he benefitted by an additional year's pension contribution. Other than his eventual replacement by a thirty-six year old, Mr. Wetmore has offered no support to justify his conclusion that he was dismissed because of his age.

John Hart, 61, complained his dismissal was based on age, also without supporting facts. Initially employed at age 58 as Dr. Jones' administrative assistant and with MBA for less than three years, he was

Assistant Director of Administration with "insufficient work to keep him occupied" when his resignation was requested by his then supervisor. (Dr. Riedy was not directly involved in this resignation.) MBA refused Mr. Hart's request to extend the termination date by six weeks to provide a 10% increase in his pension plan rights.

It is most significant that plaintiff proffers the case of Paul Herron as evidence of the pattern of age discrimination practice at MBA. Mr. Herron, then age 57, had been with MBA approximately six years and was editor of the *Mortgage Banker*, its trade magazine publication, when Dr. Riedy assumed leadership at MBA.

Upon Robert Gray's dismissal as public relations director, Mr. Herron was promoted to direct the units resulting from merger of the Gray-Herron departments. As director of communications, with a $4,000 annual salary increase, his responsibilities enlarged. At time of plaintiff's discharge Dr. Riedy assured Mr. Herron of his future with the organization and as of summer, 1978, Herron concluded "my age was not a detriment." Subsequently Herron requested a reduction in responsibilities and it was Herron himself who suggested a commensurate salary reduction. While acceding to the request in part by reducing the responsibilities, Dr. Riedy nonetheless left the salary increase fully intact. A new senior staff member was hired as director of communications and when that individual became dissatisfied with his performance, Herron was demoted. That director later secured Herron's resignation. It is manifestly unjust even to suggest age as a possible basis for resignation here. The record is not only void of even remote connection, it is wholly to the contrary: Dr. Riedy provided effort to assist and promote Mr. Herron by augmented responsibilities, salary, encouragement and, later at Herron's insistence, accession to his request for reduced duties. Simply put, Mr. Herron could not perform his responsibilities despite substantial support measures.

Dr. Riedy had little or no role in the dismissals of four clerical employees 40 and older whose services were terminated, in most cases by their own immediate supervisors. In one such matter, however, when plaintiff requested additional clerical personnel, Dr. Riedy directed Mr. Kerwood to discharge a secretary admittedly incapable of even answering the telephone, with the caveat that no additional staff position would be allocated to plaintiff's department until Mr. Kerwood improved his use of the existing positions.

Plaintiff contends that both statistics and economic motivation present MBA's pattern of age discrimination.

Dr. Paul Smith, plaintiff's expert mathematical statistician (not expert in the areas of industrial psychology/relations or employment discrimination), demonstrated that nine MBA employees aged 40 or older were dismissed (which, in these findings, includes those whose resignations were demanded) January 1, 1978—August 15, 1979, as compared with none during 1976 and 1977. He testified there is only one chance in ten thousand that this pattern could occur by chance. He had no evidence to indicate the typicality of the 1976–77 figures.

The average age of those hired to replace dismissed employees who were under 40 was closer to the average of the dismissed employees than the average age of those hired to replace dismissed employees who were 40 or older was to the average age of those latter dismissed employees. This situation would be expected if MBA hired *without* respect to the ages of applicants; it therefore of itself does not support an inference of age discrimination. Moreover, when resignations (not only dismissals) are examined the following pattern emerges:

| | Average Age |
|---|---|
| Resigned employees 40 and older | 56.67 |
| Replacements | 38.2 |
| Dismissed employees 40 and older | 54.11 |
| Replacements | 44.0 |

In other words, the employees who were dismissed tended to be younger, on the av-

erage, than all employees who severed their employment with MBA; their replacements, on the average, were older than the replacements for all employees who left.

The expert concluded that

conditions changed after December 15, 1977 and one of the effects of change was that an increasing number of older employees were fired.

The shift is that in the earlier period [1/76—12/14/77] younger employees, under 40, were disfavored, and more likely to be fired; in the second period [12/15/77—8/15/79], older employees, over 40, were disfavored, and more likely to be fired.

MBA, though, does not take the position that dismissals of the plaintiff and the other older employees came about by chance. It contends, persuasively in light of the entire case, that they were the result of a "management shakeup" produced when MBA introduced more efficient management techniques into its staff operations.

Dr. Riedy had a mandate to revitalize MBA with a forceful administration. This direction did not extend to reduction of pension and salary costs for MBA which then had a total annual budget of 4.5—5 million dollars.

MBA's pension plan is funded entirely by the employer's contributions and employees become fully vested after 10 years service. Benefits are normally payable upon the employee's retirement at age 65; the plan provides also for early retirement. The defendant's precise contribution depends on the estimated pension due an employee upon retirement; calculations are made by MBA's actuarial consultants for the eligible participating employees by May 1 of each year. The sum of these individual contributions is placed into the MBA fund shortly thereafter. The greater an employee's salary, the larger the amount MBA must contribute on his/her behalf.

The total annual contribution to the pension fund by MBA was significantly lower ($41,974) in fiscal year 1978 than the previous years; it was expected to be yet lower for fiscal year 1979. By comparison, in 1976 and 1977 MBA contributed $109,723 and $128,044, respectively.

Records and budget proposals published by the defendant attribute this difference to

staff turnover, especially among high salaried and older employees. As a result the Association's pension obligation was reduced by $103,000 . . .. The lower pension expense results from a younger staff. Also, since pension eligibility occurs following one year of employment, the newness of the staff holds down pension expense.

Plaintiff's Exhibit 9.

It is acknowledged, however, that whenever an employee leaves who is not fully vested, the lump sum he/she is entitled to is invariably lower than the total amount the employer had contributed and the amount paid to that employee remains in the fund and is credited against the next year's contribution. Clearly then, although a pension plan liability reduction is effectuated by *general* employee turnover [of all ages] the court cannot conclude that the bulk of this savings was due to turnover among older staff members.

When plaintiff was replaced by a 58 year old person the pension cost to MBA was considerably less than that which would have been the cost to MBA for plaintiff's pension had he remained in MBA's employ until age 65.[10] The record remains barren, however, of any proof that these potential reductions were known to Dr. Riedy at time of Kerwood's dismissal, or even had they been known were a motivating factor in plaintiff's dismissal.

This data, as all others, must be weighed. The totality of evidence does not provide

---

10. At 65, the usual retirement date under MBA's pension plan, plaintiff's monthly pension should have been $1,923.43, with ten years guaranteed even if he died before age 75 and even had he never received a salary increase.

If he had received cost-of-living increases averaging 7.5 per cent, his pension would have been involuntarily retired by MBA at that age. *See* 29 U.S.C.A. § 631(c)(1) (Supp.1979).

the Court the base to hoist the facts above to a reasoned conclusion that plaintiff [or the other older staff members] were terminated as a result of defendant's "crusade" to effectuate pension and salary savings. In this connection it is interesting to note that plaintiff's replacement received a higher initial salary than plaintiff had at his termination; additionally, for six months after the termination, defendant contemporaneously paid both the replacement and plaintiff while MBA completed the second half of its termination obligation to Mr. Kerwood.

■■■ It is established that plaintiff has the initial burden under the ADEA of demonstrating a *prima facie* case of age discrimination. The courts have generally continued the criteria set forth in *Wilson v. Sealtest Foods, Division of Kraftco Corp.*, 501 F.2d 84, 86, 8 FEP 749, 750 (5th Cir. 1974) where the court, while acknowledging analagous factors to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), did not rely solely upon *McDonnell* precedent to reverse a directed verdict granted defendant at conclusion of plaintiff's case, since "some explanation on the part of the employer was [justified]" when plaintiff presented a *prima facie* case in that plaintiff was within the protected age group, was asked to take early retirement against his will, was doing apparently satisfactory work,[11] and was replaced by a younger person to perform the same or similar work after his discharge.

The *McDonnell Douglas* "sensible, orderly way to evaluate the evidence"[12] brings the logic of common experience squarely into the reality of direct and circumstantial evidence. But the ultimate question remains as to whether defendant's decision to fire plaintiff was unlawfully motivated. *Id.* The inference of discrimination created by the *prima facie* case is dispelled once the employer's reason is stated, until and unless the latter is shown to be a pretext. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978).

Although the "operative principles behind *McDonnell Douglas* are applicable in age cases as in Title VII cases,"[13] that formula does not set forth unalterable illumination for all discrimination cases; its guidelines should be flexibly adapted to the varying circumstances, *Loeb v. Textron, Inc.*, 600 F.2d 1003 (1st Cir. 1979), since the *McDonnell Douglas* formula was neither intended to be "rigid, mechanized, or ritualistic," *Furnco Construction Corp. v. Waters, supra,* nor the exclusive method for proving a claim of discrimination, *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). The focus must then be whether plaintiff was discharged "because of his age," 29 U.S.C. § 623; when defendant denies that factor, the plaintiff must prove it was a determinative consideration. *Cf. Laugesen v. Anaconda Company*, 510 F.2d 307, 312 (6th Cir.), *cert. denied*, 422 U.S. 1045, 95 S.Ct. 2665, 45 L.Ed.2d 697

11. Similarly, that at the time of his discharge he was performing "at a level that met his employer's legitimate expectations," *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir. 1979).

12. Recognizing that *McDonnell Douglas* is concerned with the order and burden of proof in actions pursuant to Title VII of the Civil Rights Act of 1964, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, a statute not under consideration here, there are nonetheless persuasive similarities in the unique congressional enactment relating to age discrimination. For a comparative exposition, see *Laugesen v. Anaconda Company, infra,* 510 F.2d 307, 311–313 *cert. denied*, 422 U.S. 1045, 95 S.Ct. 2665, 45 L.Ed.2d 697 (1975); *Hodgson v. First Fed. Sav. & L.*

*Ass'n of Broward Co., Fla.,* 455 F.2d 818, 820 (5th Cir. 1972).

> With a few minor exceptions the prohibitions of this enactment are in terms identical to those of Title VII of the Civil Rights Act of 1964 except that 'age' has been substituted for 'race, color, religion, sex, or national origin.'

13. The *McDonnell Douglas* "rules" have been analogized to other ADEA cases. *See, e. g., Kentroti v. Frontier Air Lines, Inc.,* 585 F.2d 967, 969 (10th Cir. 1978); *Marshall v. Westinghouse Electric Corp.,* 576 F.2d 588, 590 (5th Cir. 1978); *Rodriguez v. Taylor,* 569 F.2d 1231, 1239 (3rd Cir. 1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978).

(1975). Age does not have to be the sole factor motivating defendant's action. Even if multiple elements affected the discharge decision, and even should the employer's justification seemingly outweigh the age consideration, plaintiff would be entitled to recover if he proved by a preponderance of the evidence that his age was any one of the factors involved in his termination and that it made any difference in determining whether he was to be retained or discharged, *Laugesen v. Anaconda Co., supra,* in the context that, "but for" his employer's motive to discriminate against him because of his age, he would not have been discharged. *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1019 (1st Cir. 1979).

█ When plaintiff established a *prima facie* case, the burden of proof shifted to the defendant to justify an articulate, legitimate nondiscriminatory reason for plaintiff's discharge, *Loeb v. Textron, Inc., 600 F.2d 1003 (1st Cir. 1979); A. A. LaRue v. Gen'l Telephone Company of the Southwest,* 545 F.2d 546 (5th Cir. 1977); *Price v. Maryland Cas. Co.,* 561 F.2d 609 (5th Cir. 1977).

Once the defendant articulated some nondiscriminatory reason for plaintiff's discharge, in this instance, Mr. Kerwood's unsatisfactory work performance highlighted by his refusal to cooperate with a new management style, the burden of production then shifted to the plaintiff to produce evidence that the stated reason was in fact an illegitimate pretext for unlawful conduct by MBA.

When a plaintiff fails to establish by a preponderance of the evidence that the stated reason was merely pretextual, defendant is entitled to judgment. The burden of persuasion remains with the plaintiff. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804, 93 S.Ct. at 1825; *Loeb v. Textron, Inc.,* supra, 600 F.2d 1003, 1015 (1st Cir. 1979); *Bishop v. Jelleff Associates,* 398 F.Supp. 579, 593 (D.D.C.1974).

█ We ask: Does an employer have a right to terminate an employee who, even though of an age protected by ADEA, either does not perform competently, or, if he does work effectively, does not perform according to that employer's reasonable and recognized expectations and needs? The answer is evident.

The law fully recognizes the employer's business necessity to make its employee judgments free from restraint "especially when a management level job is involved", *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1019 (1st Cir. 1979), *provided* only that its actions, however couched and shielded, are nondiscriminatory.

The dismissal of Lewis O. Kerwood resulted neither from his technical incompetence nor his lack of industry and innovation, nor from acts of age discrimination, but from Mr. Kerwood's continuing inability to adjust and cooperate with a new manager's style and zeal. In short, Mr. Kerwood, an autonomous star, could not now—after twenty-four years of independence—bend to the blended functioning required of a team player, despite his knowledge of the concern this attitude caused his employer. On such a collision course, his involuntary termination was predictable. Once the court is satisfied, as here, that the explanation advanced by an employer to justify an employee's dismissal was made in good faith, was not merely put forth as a pretext to shield unlawful age discrimination, and did not violate any statutory stricture, the court cannot substitute its judgment for that of the employer.

Plaintiff having failed to sustain his burden, and discrimination not proved, judgment shall be entered in favor of the defendant and plaintiff's complaint dismissed.