**Deloris M. SAUNDERS, Plaintiff,**

v.

**The GEORGE WASHINGTON UNIVERSITY, Defendant.**

**Civ. A. No. 89–2631–LFO.**

United States District Court,
District of Columbia.

June 27, 1991.

---

Abe W. Weissbrodt, John P. Racin, Weissbrodt, Racin & Mielke, Washington, D.C., for plaintiff.

Thomas D. Quinn, Jr., Jack M.H. Frazier, Michael A. Dymersky, Washington, D.C., for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

Plaintiff Saunders sues defendant The George Washington University (GWU) under the Civil Rights Act of 1866, 42 U.S.C. § 1981,[1] and the D.C. Human Rights Act Statute, D.C.Code § 1–2501 *et seq.*, for discriminating against her on the basis of her race and retaliating against her for filing this action. An Order of June 20, 1991, 768 F.Supp. 843, granted defendant's motion for summary judgment in part and denied it in part for reasons to be stated in a forthcoming memorandum. This is that memorandum.

### I.

In order to prevail on a motion for summary judgment, the moving party must "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Because defendant GWU is also the moving party, it may show that there is no genuine issue as to a particular fact by "pointing out ... that there is an absence of evidence to support the nonmoving party's case." *Celotex*

---

**1.** Section 1981 provides in pertinent part:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens....

42 U.S.C. § 1981 (1988).

*Corp. v. Cattret,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). If, however, the plaintiff does offer evidence in support of her claims, "courts must view the facts and the inferences to be drawn from the underlying facts in the light most favorable to the opposing party." *White v. Fraternal Order of Police,* 909 F.2d 512, 516 (D.C.Cir.1990) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam)). The plaintiff has accordingly offered evidence and suggested reasonable inferences to be drawn from that evidence which clearly raise genuine issues of material fact that a jury must resolve.

## A.

Deloris Saunders is black. In 1971, she earned a Ph.D. in General Educational Administration from the University of Michigan.[2] For the better part of the next fifteen years, she taught at the university level, spending the latter part of that period as an associate professor at Howard University.[3] In 1985, Saunders accepted a three-year contract to teach in what is now the Department of Educational Leadership (the "Department") at GWU.[4] In doing so, she accepted both a cut in pay and a reduction in rank to assistant professor.[5]

Saunders avers that she was not aware at the time that the School of Education and Human Development (the "School") had a custom of bringing in new faculty at the rank of their former positions,[6] or that her position had been advertised on less

attractive terms in a journal targeted at minority educators than in the *Chronicle of Education* advertisement to which she responded.[7] She was, however, aware that she was the only black in her department, and, due to her acquaintance with Lilly, it is also likely that she was aware at that time that Lilly, who was also black, left because he felt his colleagues' judgments of him became racially tainted when he sought to become an assistant Dean of the School and chair of the Department.[8]

Like Lilly, Saunders was at first well received by her white colleagues. After only a year in the Department, she became an associate professor despite a time-in-rank requirement of three years for such a promotion.[9] In 1987, however, she and George Smith, the chairman of the Department, were serving together on a dissertation committee, and they disagreed over the quality of a student's work. Smith thought it was adequate; Saunders thought it was not. Saunders submitted unnamed copies of the dissertation to other professors who agreed with her assessment.[10] There is evidence that rather than bowing to these judgments, Smith became hostile, berating Saunders in front of students and other faculty, and used his administrative position to subject her to petty indignities.[11]

Further evidence in the record suggests that this sort of behavior was uncharacteristic of Smith. In previous conflicts with

---

**2.** *See* Resume at 1 (Declaration of Janet C. Heddesheimer, Exhibit C) [hereinafter, "Resume"].

**3.** *See id.* at 2–4.

**4.** *See* Letter from Roderick S. French to Dr. Deioris M. Saunders, June 4, 1985 (Affidavit of Annie Wooldridge, Exhibit 1).

**5.** *See* First Saunders Affidavit ¶ 4.

**6.** *See id.* ¶ 5.

**7.** *See id.,* Exhibits 1 & 2; Saunders Deposition at 54.

**8.** *See* Lilly Affidavit ¶¶ 4, 6; Holmes Affidavit ¶ 8.

**9.** *See* Letter from Roderick S. French to Dr. Deloris M. Saunders, March 31, 1987 (Affidavit

of Annie Wooldridge, Exhibit 4); Polices and Procedures on Appointment, Tenure, and Promotion ¶ E.3 (Affidavit of Annie Wooldridge, Exhibit 42).

**10.** *See, e.g.,* Memorandum from Martha Rashid to Professor Saunders, June 3, 1987 (Smith Deposition, vol. 1, GS–6, at 20); Memorandum from Carol Hoare to Dr. Deloris Saunders, June 8, 1987 (Smith Deposition, vol. 1, GS–7, at 22).

**11.** *See* Memorandum from Harriet Hunter–Boykin, Ed.D., to Abe Weissbrod[t], April 23, 1990 (Smith Deposition, vol. 1, GS–5, at 18); Letter from Deloris M. Saunders to Annie Wooldridge, December 8, 1988 (Affidavit of Annie Wooldridge, Exhibit 19).

white colleagues, Smith was not confrontational at all; quite to the contrary, there is evidence that he shrank from contact, much less open conflict, with people with whom he had disagreements.[12] According to Saunders, he could not abide the notion that a black person would resist him and act as if she were really his equal. This assessment is supported by Dr. Lilly's experience in the Department. Moreover, there is testimony that Dean Leonard concluded from Smith's treatment of Saunders that Smith had racist tendencies.[13]

### B.

In October of 1987, Saunders requested that a tenure track position be created in the program in educational administration coordinated by her.[14] She also requested that her position be converted from contract to tenure-accruing.[15] There is evidence that in the School individuals appointed to tenure-accruing positions almost always shortly thereafter receive tenure.[16] Tenure, of course, guarantees employment for life subject only to good behavior, continued teaching, or extraordinary financial exigency, thereby relieving a professor from the threat of periodic decisions whether to renew her contract and freeing her to design her own course of study.[17]

Other evidence suggests that the program on educational administration needed a tenure track position. Dr. Lilly had been tenured, and since he left the program it had grown under Saunders into the second largest program in the School.[18] There is also substantial evidence that Saunders was qualified for a tenure track position. As mentioned before, she has a Ph.D. in Educational Administration, and since shortly after her arrival at GWU she was a member of the Advanced Graduate Faculty with as important teaching responsibilities as any tenured faculty member.[19] Indeed, several colleagues have testified to her qualifications, and one has even testified that a challenge to her academic credentials in 1987 would have seemed ridiculous.[20] Moreover, it is undisputed that because she was hired in 1985 pursuant to a national search, the Department could have converted her to tenure-accruing status without conducting another nationwide search.[21]

Nonetheless, action on Saunders' request was deferred.[22] At Smith's insistence, the tenured faculty of the Department decided to defer action until it had gathered more information about enrollment in the program.[23] Although Smith promised to assemble the information "as expeditiously as possible,"[24] he never consulted the Of-

12. *See* Smith Deposition at 87.

13. *See* Wooldridge Deposition at 22, 45; *see also* Fed.R.Evid. 801(d)(2)(D) (directing that statements of employees within the scope of their employment not be treated as hearsay).

14. *See* Memorandum from Deloris M. Saunders to Dr. George Smith, October 20, 1987 (Affidavit of Annie Wooldridge, Exhibit 6).

15. *See* Memorandum from Deloris M. Saunders, Ph.D., to The Faculty, Department of Educational Leadership, October 20, 1987 (Affidavit of Annie Wooldridge, Exhibit 6) (attachment).

16. *See* Greenberg Affidavit ¶ 12; Holmes Affidavit ¶ 5; Lilly Affidavit ¶ 8; Paratore Affidavit ¶ 7.

17. *See* Defendant's Motion for Summary Judgment at 17.

18. *See* Memorandum from Deloris M. Saunders, Ph.D., to The Faculty, Department of Educational Leadership, October 20, 1987; Memorandum

from Jay R. Shotel to Dr. George Smith, March 9, 1988 (Smith Deposition, vol. 1, GS–11, at 32); Greenberg Affidavit ¶ 3; Lilly Affidavit ¶ 3.

19. *See* Second Cunningham Affidavit ¶ 3; First French Declaration ¶ 6.

20. *See* 1988–89 Annual Report (First Saunders Affidavit, Exhibit 4); Greenberg Affidavit ¶ 2; Holmes Affidavit ¶ 2; Paratore Affidavit ¶ 2.

21. *See* Memorandum from Roderick S. French to George Smith, November 30, 1989 (Plaintiff's Opposition, Exhibit 1); Memorandum from Jay R. Shotel to Dr. George Smith, March 9, 1988.

22. *See* Memorandum from George W. Smith to Dr. Deloris Saunders, November 23, 1987 (Affidavit of Annie Wooldridge, Exhibit 7).

23. *See* Greenberg Affidavit ¶ 3.

24. Memorandum from George W. Smith to Dr. Deloris Saunders, November 23, 1987.

fice of Institutional Research where such data was readily available.[25] Indeed, when acting Dean Shotel wrote Smith in the spring of 1988 that the educational administration program had considerable enrollment and urged that action be taken quickly on Saunders' request, Smith did not inform the members of the Department of Shotel's letter and continued to assert concerns over enrollment in the program.[26] Smith also asserted that action on Saunders' request should be deferred because Leo Leonard, who was about to become dean of the School, was an expert in policy studies; Leonard, however, has testified that he has no training or expertise in that field.[27]

## C.

On September 21, 1988, Saunders renewed her request for a tenure-accruing position in the program on educational administration.[28] This time the Department voted to create such a position, but five members of the Department—Smith, John Boswell, Martha Burns, Dorothy Moore, and Martha Rashid—also voted to deny Saunders' request for conversion, thereby defeating the request by one vote.[29] If a vote had been taken a year earlier, it is likely that at least Rashid would have voted in favor of Saunders based upon her academic qualifications.[30]

Although Saunders immediately requested an explanation of the decision, Smith did not respond for over a month, when Dean Leonard demanded that he do so.[31] Smith then informed Saunders that the faculty expressed concern over her performance in four areas:

1. The faculty feels that a problem exists in your listening to and working with your colleagues.

2. They perceive a problem in your failing to work administratively with the Department Chair.

3. The manner in which the LEAD Project was negotiated was considered unprofessional.

4. Informing the Dean and the Chair of an anticipated absence and the list of instructors to teach classes only a few days in advance was also considered unprofessional.[32]

Saunders appealed, charging that her evaluation "failed to address the published criteria governing appointment, tenure and promotion." [33] Neither party has, however, identified those criteria.

Saunders' appeal was never completed. Appeals in the School are decided by a three-member committee, one appointed by

**25.** *See* Paratore Affidavit ¶ 3.

**26.** *See* Memorandum from George W. Smith to Dr. Deloris Saunders, March 28, 1988 (Affidavit of Annie Wooldridge, Exhibit 8); Memorandum from George W. Smith to Professors Brown, Saunders, and Willett, May 5, 1988 (Smith Deposition, vol. 1, GS–15, at 39); Memorandum from Jay R. Shotel to Dr. George Smith, March 9, 1988; Holmes Affidavit ¶ 9; Paratore Affidavit ¶ 5.

**27.** *See* Memorandum from George W. Smith to Dr. Deloris Saunders, March 28, 1988; Leonard Deposition at 181–82.

**28.** *See* Memorandum from Deloris M. Saunders to Faculty, Department of Educational Leadership, September 22, 1988 (Affidavit of Annie Wooldridge, Exhibit 11); Memorandum from Deloris M. Saunders to Faculty, Department of Educational Leadership, September 21, 1988 (Affidavit of Annie Wooldridge, Exhibit 10).

**29.** *See* Memorandum from George W. Smith to Deloris Saunders, October 24, 1988 (Affidavit of Annie Wooldridge, Exhibit 13); First Smith Affidavit ¶ 2.

**30.** *See* Rashid Deposition at 57.

**31.** *See* Memorandum from George W. Smith to Dr. Deloris Saunders, December 6, 1988 (Affidavit of Annie Wooldridge, Exhibit 18); Memorandum from Leo D. Leonard to George Smith, December 5, 1988 (Smith Deposition, vol. 3, GS–83, at 144); Letter from Deloris M. Saunders to Dr. George Smith, November 7, 1988 (Affidavit of Annie Wooldridge, Exhibit 15); Letter from Deloris M. Saunders to Dr. George Smith, October 24, 1988 (Affidavit of Annie Wooldridge, Exhibit 14).

**32.** Memorandum from George W. Smith to Dr. Deloris Saunders, December 6, 1988.

**33.** *See* Letter from Deloris M. Saunders to Dr. Leo Leonard, January 27, 1989 (Affidavit of Annie Wooldridge, Exhibit 20).

the protesting professor, one by the Department, and one by agreement between the parties.[34] The Department, however, rejected three of Saunders' recommendations for the third member of the committee and made none of its own.[35] According to Saunders, these actions led her designated panel member "to resign in disgust" and led Saunders to refuse to continue in a process that she considered to be "an exercise in humiliation."[36]

There is also evidence from which it might be inferred that at about the same time members of the Department embarked upon a plan to stymie Saunders' hopes of conversion. In 1988, Dr. Brown, who was also part of the program on educational administration, was preparing to leave the university. Accordingly, Smith appointed an "Ad Hoc Search Committee for an Educational Administration Faculty Position." Saunders served upon the committee, along with Drs. Boswell and Burns, who acted as the chairwoman of the committee. With the apparent approval of the Department, the committee recommended the creation of a tenure track position in the program on educational administration. On January 5, 1989, Smith transmitted relevant materials to Dean Leonard, including a copy of a proposed advertisement for the committee.[37] A week later, Burns submitted similar, but in one respect significantly different, material to Annie Wooldridge, the University's equal employment opportunity officer.[38] Based upon the material submitted to her, Wooldridge approved the Department's recruitment plan.[39]

Meanwhile, the Dean had determined that there was "no possibility of having two tenure positions at the present time in Ed Administration."[40] As a consequence, the Dean suspected that by seeking a new tenure track position in the program the Department was trying to block Saunders' conversion request through the back door.[41] It is therefore worthy of note that the advertisement submitted by Burns to Wooldridge did not mention that the new position in the program was to be tenure-accruing. Burns has testified that she thought a tenure track position could be advertised without any reference to tenure,[42] but GWU has offered no basis for this opinion, nor could it or Burns explain why she deleted the words "tenure track" from the advertisement given to Wooldridge when the one submitted the week before to Dean Leonard contained them. Upon learning of this discrepancy, Wooldridge immediately withdrew her approval of the Department's recruitment plan on the ground that she had a approved only a non-tenure-accruing position.[43]

Dr. Burns informed the Department of Wooldridge's decision, but she failed to explain the reasons for it.[44] Nor was the Department informed that approval of the new tenure track position would affect Saunders' chances for obtaining such a po-

34. See Memorandum from George W. Smith to Tenured Faculty Members, January 31, 1989 (Affidavit of Annie Wooldridge, Exhibit 21).

35. See Letter from Deloris M. Saunders to Leo D. Leonard, May 25, 1989 (Affidavit of Annie Wooldridge, Exhibit 25).

36. Id.

37. See Memorandum from George Smith to Leo Leonard, January 5, 1989 (Smith Deposition, vol. 3, GS–38, at 5).

38. See Memorandum from Martha Burns to Anne Wooldridge, January 12, 1989 (Smith Deposition, vol. 3, GS–39, at 7).

39. Memorandum from Annie Wooldridge to Dr. Martha Burns, January 12, 1989 (Smith Deposition, vol. 3, GS–41, at 28).

40. Memorandum from Leo D. Leonard to Carol Hoare, January 11, 1989 (Smith Deposition, vol 3, GS–56, at 66).

41. See Memorandum from Dean Leo D. Leonard to Roderick French, January 6, 1989 (Smith Deposition, vol. 3, GS–45, at 42).

42. See Burns Deposition at 87–89.

43. See Memorandum from Annie Wooldridge to Dr. Martha Burns, January 18, 1989 (Smith Deposition, vol. 3, GS–58, at 70).

44. See Greenberg Affidavit ¶ 6; Paratore Affidavit ¶ 6; Department Meeting, February 16, 1989 (Smith Deposition, vol. 3, GS–43, at 33).

sition.[45] Ultimately, however, Vice–President Roderick French rejected the Department's request for a new tenure-accruing position, stating that it would be unfair to give a tenure-accruing position to a new professor when Saunders had been seeking conversion for several years.[46]

When a replacement for Dr. Brown was finally sought, on a contract basis, the Department interviewed a black educator named Paul F. Scott and offered him a salary of $30,000 a year and the rank of assistant professor.[47] The position was, however, finally awarded to Jane McDonald, a white woman, at a salary of $38,000 a year and the rank of associate professor.[48] At the hearing on May 31, 1991, counsel for GWU explained this discrepancy by representing that McDonald had negotiated a better deal for herself.

### D.

On October 6, 1989, Saunders renewed her request for conversion and also requested promotion to full professor.[49] It is unclear whether Saunders was eligible for such a promotion: While the School rules seem to require that she have five years time in rank before becoming a full professor, the same rules also required her to have three years time in rank before being promoted from assistant to associate professor.[50] In any event, promotion to full professor would have greatly increased Saunders' prestige in the academic world and allowed her to participate fully in the governance of the University.[51]

Saunders' request was delayed and then denied. Consideration of her request was deferred from the regular Departmental meeting on October 20 until December 1, 1989.[52] Dr. Burns has testified that she inadvertently stumbled upon some discrepancies the morning of December 1, 1989. According to her testimony, she went to the library to read something published by Saunders, by chance happened to pick an item listed as pending in Saunders' previous resume, and then, when she could not find that item, allegedly searched the library.[53] A reasonable jury could draw adverse inferences, however, from Burns' failure (to date at least) to explain why she chose a work listed as pending, why she went to the library rather than to the departmental office where Saunders' works were on file, or why she waited until December 1, 1989 to read something published by Saunders.

At the Departmental meeting later that day, Burns along with Smith and Boswell questioned whether two publications listed upon Saunders' resume as pending were in fact pending.[54] At the request of Dr. Greenberg, however, the Department decided to give Saunders an opportunity to respond to these charges of dishonesty, a procedural courtesy customary in academic circles.[55] Less than a week later, Saunders explained that included in the materials submitted to the Department were letters showing that both works had been accepted

**45.** *See* Greenberg Affidavit ¶ 5; Holmes Affidavit ¶ 10.

**46.** *See* French Deposition at 142–45; *but see* Leonard Deposition at 347 (testifying that French, at least initially, recommended that the faculty vote on the Department's proposal).

**47.** *See* Plaintiff's Statement of Material Facts not in Genuine Issue, Exhibit 8.

**48.** *See* Plaintiff's Statement of Material Facts not in Genuine Issue, Exhibit 9.

**49.** *See* Memorandum from Deloris Muldrow Saunders to The Faculty, Department of Educational Leadership, October 6, 1989 (Affidavit of Annie Wooldridge, Exhibit 28); Memorandum from Deloris Saunders to Dr. George

Smith, September 20, 1989 (Affidavit of Annie Wooldridge, Exhibit 27).

**50.** *See* Policies and Procedures on Appointment, Tenure, and Promotion ¶ E(3).

**51.** *See* Greenberg Affidavit ¶ 13; Lilly Affidavit ¶ 9.

**52.** *See* Memorandum from George W. Smith to Dr. Deloris Saunders, October 20, 1989 (Affidavit of Annie Wooldridge, Exhibit 29).

**53.** *See* Burns Deposition at 113.

**54.** *See* Greenberg Affidavit ¶ 7.

**55.** *See id.* ¶ 7; First Cunningham Affidavit ¶ 4.

for publication and were still viable.[56] Nonetheless, Smith, Burns, and Boswell, joined by Drs. Moore and Rashid, voted to deny Saunders' request—but this time because of her lack of publications.[57]

There is considerable evidence from which a jury could conclude that this rationale was a mere pretext. It is undisputed that the Department had never before scrutinized a resume so closely.[58] From that fact and from the manner in which Smith, Burns, and Boswell accused Saunders of dishonesty and their abrupt abandonment of that criticism for another in the face of Saunders' explanation, a jury could infer that their allegations were pretextual. For similar reasons, a reasonable jury could draw an adverse inference from the as-yet undisputed fact the Department had never before made publication activity a priority.[59] Furthermore, Saunders has provided expert testimony that she could not have reasonably been expected to publish more given her heavy workload.[60] Indeed, both Boswell and Burns have since testified that her publication record was not an adequate justification for denying her requests for conversion and for promotion.[61]

There is also evidence of retaliatory motive. A jury might find the sequence alone probative: Saunders filed the instant complaint in September, 1989, and a little more than two months later, three of the persons that Saunders alleged had discriminated against her returned with serious charges of misconduct against her. Vice–President French also worried about retaliation: On November 30, 1989, he warned Smith to "give no consideration to the pending lawsuit when acting on Dr. Saunders' request." [62] Finally, there is evidence that Dr. Dorothy Moore admitted "something very close to 'Frankly, I would have voted for her if she hadn't sued us for racial discrimination.' " [63]

### E.

At the spring 1990 personnel meeting, although Saunders had not formally applied for renewal of her contract, the Department considered whether to offer Saunders a new contract after her current one expired on May 31, 1991.[64] Smith reported that the Department decided not to renew her contract for four different reasons. First, there was continuing concern over her publication record. Some members of the committee "observed that you had mislabeled or failed to provide the faculty with corrections or had otherwise failed to provide satisfactory explanations regarding apparent discrepancies." [65] Others noted that she had published only one article in a refereed journal and that several articles had been listed as pending for more than six years. Second, members of the committee criticized her grant work, particularly because she had not formally cleared the only project attracted by her. Third, some noted dissatisfaction with the fact that she had failed to have the LEAD program project approved by the Department before it was submitted for accreditation. Fourth, there was "concern among the faculty committee about your teaching credentials in educational administration. The Committee is aware that your degree is in general administration." [66]

Here again, there is evidence that some of these reasons were pretextual. First,

---

**56.** *See* Memorandum from Dr. Deloris M. Saunders to Dr. George W. Smith, December 6, 1989 (Smith Deposition, vol. 3, GS–53, at 62).

**57.** *See* Memorandum from George W. Smith to Dr. Deloris Saunders, December 12, 1989 (Affidavit of Annie Wooldridge, Exhibit 31).

**58.** *See* Boswell Deposition at 359; Greenberg Affidavit ¶ 7.

**59.** *See* Holmes Affidavit ¶ 4.

**60.** *See* First Cunningham Affidavit ¶ 3.

**61.** *See* Boswell Deposition at 367; Burns Deposition at 247.

**62.** Letter from Roderick S. French to George Smith, November 30, 1989.

**63.** Greenberg Affidavit ¶ 11.

**64.** *See* Memorandum from George W. Smith to Dr. Deloris Saunders, April 23, 1990 (Affidavit of Annie Wooldridge, Exhibit 33).

**65.** *Id.* at 1.

**66.** *Id.* at 2.

Saunders provided explanations for all the apparent discrepancies in her resume.[67] Second, her degree, as is apparent from her resume, was in general educational administration, not general administration. Furthermore, decisions not to renew contracts at the School are apparently rare.[68]

### F.

On September 24, 1990, Saunders applied a final time for conversion to a tenure track position "based upon events which have transpired, and information which has been developed since the last vote taken upon the conversion issue in December 1989."[69] Vice–President French, however, wrote to Saunders on October 5, 1990 that the matter of her employment with University was already closed.[70] He considered the Department's vote not to renew her contract to have "enunciated its position vis-a-vis [Saunders'] retention at this institution."[71] He also added that the President had "instituted a moratorium that prohibits the conversion of any occupied contract position to tenure line."[72] This last statement is in apparent conflict with French's statement less than a year earlier that during the moratorium many departments had made recommendations for conversion which he had simply added to the existing inventory.[73]

### II.

The Supreme Court has held that § 1981 applies to the "refusal to enter into a contract with someone, as well as to make a contract only on discriminatory terms." *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 2372, 105 L.Ed.2d 132 (1989). Conversely, the Supreme Court held that § 1981 does not apply "to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions." *Id.* 109 S.Ct. at 2373. Thus, " 'postformation conduct' such as racial discrimination during a contractual term of employment is not governed by § 1981." *Gershman v. Group Health Assoc., Inc.*, 931 F.2d 1565, 1570 (D.C.Cir.1991).

GWU contends that Saunders complains of postformation conduct and therefore has failed to provide evidence supporting all the elements of a § 1981 claim. The conduct in question—the denial of Saunders' requests for conversion to a tenure track position, her request for promotion to full professor, and the decision not to renew her contract—could, however, be characterized as both contract formation and postformation conduct. As a consequence, it is necessary to examine these different claims in more detail.

### A.

■ Saunders' request for conversion is in essence a request that she be promoted from a contract position to a tenure-accruing one. In *Patterson*, the Supreme Court refused to formulate a bright line rule for promotions. Instead, it deemed the issue to be a factual one properly determined on a case-by-case basis:

[T]he question whether a promotion is actionable under § 1981 depends upon whether the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer. If so, then the employer's refusal to enter the new contract is actionable under § 1981. In making this determination a lower court should give a fair and natural reading to the statu-

---

**67.** *See supra* note 57; *see also* Letter from Gordon Cawelti to Whom It May Concern, February 9, 1990 (Smith Deposition, vol. 3, GS–52, at 61).

**68.** *See* Holmes Affidavit ¶ 11; First Saunders Affidavit ¶ 12.

**69.** Memorandum from Deloris M. Saunders to Tenured Faculty, Department of Educational Leadership, September 24, 1990 (Affidavit of Annie Wooldridge, Exhibit 37).

**70.** *See* Letter from Roderick S. French to Dr. Deloris M. Saunders, October 5, 1990 (Affidavit of Annie Wooldridge, Exhibit 38).

**71.** *Id.*

**72.** *Id.*

**73.** *See* Memorandum from Roderick S. French to George Smith, November 30, 1989.

tory phrase "the same right ... to make ... contracts," and should not strain in an undue manner the language of § 1981. Only where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable under § 1981. *Cf. Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (refusal of law firm to accept associate into partnership) (Title VII).

*Patterson,* 109 S.Ct. at 2377.

If Saunders had achieved tenure, she surely would have entered into "a new and distinct relation" with GWU. As a contract employee, the term of her employment with GWU was limited to three years, and the University could refuse to renew her contract for any reason not prohibited by law. By contrast, once Saunders obtained tenure, she would have been guaranteed life long employment with GWU and could not have been terminated except in most unusual circumstances. *See supra* 858 & n. 16. GWU observes that tenured and tenure-accruing status are not the same and that "the decision to grant tenure is never considered as automatic or a mere formality." First French Affidavit ¶ 2. Be that as it may, it is undisputed that in the School persons appointed to tenure-accruing positions almost always receive tenure shortly after their appointment. *See supra* 858 & n. 15. Moreover, the tenured members of the Department treated the vote on Saunders' request for conversion to tenure-accruing status as a vote on tenure. *See* Holmes Affidavit ¶ 6; *see also* Memorandum from George W. Smith to Dr. Deloris Saunders, November 23, 1987 (referring to her request for conversion as a "proposal to be granted tenure"); Memorandum from George W. Smith to Deloris Saunders, October 24, 1988 (same). Based upon this evidence, a reasonable jury could conclude that tenure-accruing status was nearly equivalent to tenured status and therefore constituted a "new and distinct relation between the employee and the employer." Thus, there is a genuine issue as to wheth-

er Saunders' request for tenure is actionable under § 1981.

### B.

■ It is even more apparent that promotion to full professor would have created a new and distinct relation between Saunders and GWU. In *Patterson,* the Supreme Court cited the promotion from associate in a law firm to partner as the paradigm "opportunity for a new and distinct relation between employer and employee." *See Patterson,* 109 S.Ct. at 2377. As an associate professor, Saunders was an employee without any say in the management of her Department or the University. By contrast, as a member of the tenured faculty, Saunders would have had a say in the governance of the University. *See* Lilly Affidavit ¶ 9. Thus, just like an associate who becomes a partner, an associate professor who becomes a fully professor is transformed from an employee into one of the employers.

### C.

■ By contrast, there would have been no such transformation in Saunders' relation with GWU if her contract had been renewed. She would have had no greater say in decisions of the Department, nor indeed is there any indication that the terms and conditions of her employment would have changed. Moreover, our Court of Appeals has recently held that renewal of a contract in a manner that "did not require the parties to reach a new agreement" does not constitute the kind of contract formation conduct envisioned by *Patterson. See Gershman v. Group Health Assoc., Inc.,* at 1572–73. Indeed, in reaching that decision, the Court of Appeals favorably cited a case holding that the refusal to renew the contract of a Loyola professor "employed under a series of one year contracts" did not implicate § 1981. *Chawla v. Klapper,* 743 F.Supp. 1284, 1290 (N.D.Ill.1990). Thus, under the Court of Appeals' reasoning, the Department's refusal to renew Saunders' contract is not actionable under § 1981. Accordingly, the Order of June 20, 1991, entered summary judgment on Saunders' claims under

§ 1981 concerning the nonrenewal of her contract.[74]

## III.

GWU also contends that Saunders has failed to make out a prima facie case of discrimination. In particular, it claims that Saunders has failed to show that she was qualified to be either a tenured faculty member or a full professor, that tenure track positions were available, or that the university was still seeking applicants for the positions for which Saunders applied. These arguments not only fail to recognize the ample evidence of discrimination in the record; they also misconstrue the manner in which discrimination may be proved in § 1981 cases.

 In *Patterson*, the Supreme Court recognized that the "carefully designed framework for proof" used in Title VII cases to determine whether "the defendant has intentionally discriminated against the plaintiff" should be applied in § 1981 cases as well. *Patterson*, 109 S.Ct. at 2377. That framework, developed primarily in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), was created "to assure that the plaintiff has his day in court despite the unavailability of direct evidence." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985) (quotation and quotation marks omitted). If, however, direct evidence of discrimination is available, the plaintiff need not use this framework. *See id.* at 121–22, 105 S.Ct. at 622. Here, there is direct evidence of disparate treatment due to race. Even before Saunders' requests for conversion, Smith treated her more hostilely than his white colleagues. *See supra* 857–858. Moreover, both Dean Leonard and GWU's equal employment opportunity officer opined that this treatment reflected racist tendencies. *See* Wooldridge Deposition at 22, 45; *see also* Fed.

R.Evid. 802(d)(2) (noting that admissions of an employee within the scope of their employment are not hearsay). Finally, there is evidence of a pattern of discrimination in the Department in the treatment of Lilly, the advertisement for his replacement, the terms of Saunders' initial contract, and the terms offered to Dr. Scott. *See supra* 857, 860–861. Based upon this evidence, a jury could reasonably conclude that Smith and other members of the Department cast the deciding vote against Saunders' requests out of racial animus.

 Furthermore, Saunders has made out a prima facie case under *McDonnell Douglas* and *Burdine.* "The burden of establishing a prima facie case of disparate treatment is not onerous." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. Rather than providing definitive proof of discrimination, the prima facie case "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." *Id.* at 254, 101 S.Ct. at 1094 (citation omitted). Thus, the prima facie case typically requires a plaintiff to eliminate the most obvious reasons for rejection such as lack of qualifications or lack of availability of the job. Here, however, there were no such obvious reasons for rejecting Saunders' requests for conversion and for promotion: Four members of the Department consistently voted in favor of Saunders' requests. *See* First Smith Affidavit ¶ 2. Moreover, as detailed above, there is substantial evidence that the nondiscriminatory justifications offered for denial of those requests were pretextual. *See supra* 858, 860–861, 861–862, 862–863. As a consequence, Saunders has raised a genuine issue as to whether her requests were rejected for discriminatory reasons.

GWU correctly notes that Saunders has not shown that it was still looking for applicants for the tenure track and full professor positions that Saunders sought. It also correctly observes that such a showing is normally part of the prima facie case under the *McDonnell Douglas/Burdine* framework of proof. *See, e.g., McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824.

---

**74.** In reaching this conclusion, the Court offers no opinion on whether Saunders states a claim under the D.C. Human Rights Act Statute based upon the decision not to renew her contract.

It does not, however, follow that Saunders has failed to satisfy her prima facie case. The *McDonnell Douglas/Burdine* framework was "never intended to be rigid, mechanistic, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). Thus, the elements of the prima facie case must be adapted to the context of the particular employment decision at issue. *Cf. EEOC v. Brown & Root, Inc.*, 688 F.2d 338, 340–41 (5th Cir.1982) (discriminatory discharge). In a commercial setting, it makes sense to require an employee to show that the employer is still seeking applicants for a particular job because a commercial employer has a strong incentive to fill all needed positions. By contrast, a university considering whether to grant tenure or promote an individual to full professor has no such incentives because the university can always fill a particular teaching slot with contract rather than tenured and associate rather than full professors. As a consequence, there is no reason to require Saunders to show as part of her prima facie case that the University is actively seeking a full, tenured professor in educational administration. *See, e.g., Banerjee v. Board of Trustees of Smith College*, 648 F.2d 61, 62 (1st Cir.1981) (requiring a professor denied a tenured position only to show that such positions were available).

GWU also contends that conversion was not available to Saunders. Specifically, it contends that the faculty had a policy of requiring a competitive search before allowing a contract professor to convert to a tenure track position. This rationale was, however, never offered by the Department. Indeed, in November of 1989, Vice–President French wrote to Smith, apparently at Smith's behest, to inform him that individuals who, like Saunders, joined the faculty subject to a national search prior to 1986 were eligible for immediate conversion. *See* Memorandum from Roderick S. French to George Smith, November 30, 1989. A

reasonable jury could certainly conclude based upon this evidence that Saunders was eligible for conversion.

GWU also argues that after August, 1988, President Trachtenberg placed a moratorium upon conversions. *See* Trachtenberg Affidavit ¶ 2. Here again, however, no mention was made of the moratorium in the Department's decisions; only Vice–President French mentioned it in his letter of October 5, 1990. More importantly, there is no evidence that the moratorium prevented the Department from granting Saunders' request for conversion. Quite to the contrary, in November of 1989 Vice–President French noted that since the moratorium was announced, "departments and deans have come forward with recommendations or requests to convert people holding such appointments." Memorandum from Roderick S. French to George Smith, November 30, 1989. Furthermore, far from indicating that the moratorium prevented departments from making recommendations for conversion, French indicated that he "simply added those requests to the existing inventory." *Id.* In light of this evidence and the deference that administrators at GWU traditionally give to departmental personnel decisions, *see* French Deposition at 125–26, 190, a reasonable jury could conclude that the moratorium would have delayed conversion, but not prevented it.

With respect to Saunders' request for promotion, GWU points out that she had failed to satisfy the five year time-in-rank requirement. *See* Policies and Procedures on Appointment, Tenure and Promotion ¶ E(3). The Department did not, however, invoke this justification. *See supra* 859, 861, 862. Moreover, in 1986, Saunders was promoted from assistant to associate professor despite failing to satisfy an analogous time-in-rank requirement. *See* Policies and Procedures on Appointment, Tenure and Promotion ¶ E(3). Accordingly, a reasonable jury could conclude that the Department had the power to waive or ignore the five year time-in-rank requirement.

Finally, GWU argues that Saunders was not qualified to work at GWU because she

had displayed a lack of candor, among other things, in her resume. *See, e.g., Williams v. Boorstin*, 663 F.2d 109, 117 (D.C.Cir.1980). However, there is ample evidence from which a reasonable jury could conclude that the allegations of dishonesty and misrepresentation were not well-founded and, in fact, were pretextual. For present purposes, it is only necessary to note that Saunders's expert, after reviewing all of the allegations of dishonesty and lack of candor, has averred that Saunders' responses to these allegations reflect accepted academic practice, that the allegations therefore appear to be baseless, and that in his opinion Saunders possesses the integrity necessary to teach at any university. *See* Third Cunningham Affidavit ¶ 7. Moreover, a reasonable jury could infer that Saunders possesses such integrity from the fact that four of her colleagues believed that she was qualified to be a tenured professor, or indeed from the fact that GWU allowed her to teach despite these allegations of dishonesty until her contract had expired. Accordingly, there is a genuine issue as to Saunders' qualifications.

In sum, Saunders has provided both direct and circumstantial evidence of discrimination. Given the fact that Saunders has provided evidence that all but one of her claims involved the making of contracts as well, it follows that she has provided sufficient evidence to go to the jury on all but one of her discrimination claims under § 1981.

## IV.

In the alternative, GWU contends that Saunders' § 1981 claims are barred because the statute of limitations upon those claims is only one year and that that limitations period has run. This contention is without foundation either in law or in fact.

 In the first place, the complaint in this matter was originally filed on September 22, 1989. As a consequence, the Department's decision to deny Saunders' renewed request for conversion in October, 1988, and all subsequent actions occurred less than a year before the complaint was

filed. GWU, however, contends that once Saunders and Smith locked horns in 1987 it was clear that Saunders would not gain tenure. It therefore concludes that "plaintiff's *sole* purpose in applying for conversion was to create a dispute with the department chair and the [Department] for the express purpose of filing the instant litigation." Defendant's Motion for Summary Judgment at 13 (emphasis in original). Given the four votes in her favor and Rashid's statement that Smith would have looked ridiculous opposing her requests in 1987, *see* Rashid Deposition at 57, a jury could reasonably conclude that Saunders' requests were quite viable. More fundamentally, even if she requested conversion knowing that Smith would discriminate against her, the mere threat of such discrimination does not bar one from requesting a promotion for which one is qualified.

 Furthermore, the applicable statute of limitations is not one year, but three. It is well-settled that the statute of limitations for federal civil rights statutes like § 1981 are drawn from the most "appropriate" or analogous state statute of limitations. *See* 42 U.S.C. § 1988; *Wilson v. Garcia*, 471 U.S. 261, 267, 105 S.Ct. 1938, 1942, 85 L.Ed.2d 254 (1985). GWU contends that the most appropriate D.C. statute of limitations for § 1981 is the one-year period in the D.C. Human Rights Act Statute. *See Davis v. Potomac Elec. Power Co.*, 449 A.2d 278 (D.C.1982) (applying D.C.Code § 1–2544(a)). This argument is squarely precluded by court of appeals precedent. In *Banks v. Chesapeake & Potomac Telephone Co.*, our Court of Appeals held that D.C.'s statute of limitations for torts is more appropriate than the one-year statute of limitation in the D.C. Human Rights Act Statute. *See Banks v. Chesapeake & Potomac Telephone Co.*, 802 F.2d 1416, 1423–26 (D.C.Cir.1986). Accordingly, GWU's argument must be rejected.

GWU notes that the Court of Appeals has suggested that the proper statute of limitations is not entirely settled. *See Berger v. Iron Workers Reinforced Rodmen, Local 201*, 843 F.2d 1395, 1410 (D.C.Cir.

1988). In particular, several circuits have held that § 1981 violations are more akin to intentional torts than general torts, *see Banks*, 802 F.2d at 1427, which raises the question of whether D.C.'s one-year limitation period for intentional torts in D.C.Code § 12–301(4) should be applied rather than the three-year limitation period for general torts under D.C.Code § 12–301(8). GWU has not, however, argued that the limitations period for intentional torts should be used. Under *Banks*, this argument has therefore been waived. *See id.* Moreover, even though there are indications that the Court of Appeals may be ready to consider whether the intentional torts statute of limitations should be applied, *see id.* at 1434–36 (Buckley, J., concurring in the result), there is nonetheless considerable precedent indicating that the three-year residual statute of limitations in D.C.Code § 12–301(4) should be used. *See, e.g., Macklin v. Spector Freight Systems, Inc.*, 478 F.2d 979, 994 (D.C.Cir.1973). In the absence of a clear statement by the Court of Appeals that this precedent is no longer binding, it must be followed.

■ In any event, even if a one-year limitations period applied, the running of that period would have been tolled. The Department did not provide Saunders with a definitive rejection of her request for conversion until October 24, 1988. *See supra* at 859–860. As a consequence, she did not have a basis for filing claims based upon the deferrals of her 1987 requests until the actual rejection occurred. Therefore, the running of the statute of limitations was tolled until October, 1988. *See, e.g., Fitzgerald v. Seamans*, 553 F.2d 220, 228 (D.C.Cir.1977).

Accordingly, none of Saunders' claims are time barred.

### V.

GWU also contends that Saunders' retaliation claims must be dismissed. First, it argues that § 1981 does not provide a cause of action for retaliation. Second, GWU argues that there was no retaliation in this case because after this complaint was filed the Department merely denied Saunders' requests to reconsider its 1988 decision to deny Saunders tenure. Only the former contention is persuasive.

■ It seems clear, at least since *Patterson*, that in this Court the right to make and enforce contracts under § 1981 does not bring with it a separate right against retaliation. *See, e.g., Scales v. George Washington University*, 1991 U.S.Dist.LEXIS 3887, at *13 (D.D.C. March 25, 1991); *Williams v. Nat'l R.R. Passenger Corp.*, 716 F.Supp. 49, 51–52 (D.D.C.1989). Nor is there any indication in this case that GWU barred Saunders from enforcing contracts in the courts. *See Miller v. SwissRe Holding, Inc.*, 731 F.Supp. 129, 132 (S.D.N.Y.1990). Accordingly, the Order of June 20, 1991 entered summary judgment in favor of Saunders on all retaliation claims under § 1981.

■ Saunders does, however, have viable claims for retaliation under the D.C. Human Rights Act Statute. That statute specifically provides a cause of action for retaliation. *See* D.C.Code § 1–2525(a) (1981).[75] To prove such a claim, one must show (1) that one was engaged in a protected activity, (2) that the employer took adverse action, and (3) that there was a causal connection between these two events. *See, e.g., Goos v. Nat'l Ass'n of Realtors*, 715 F.Supp. 2, 3 (D.D.C.1989). GWU contends that Saunders has failed to present evidence supporting the third element of her claim because the denial of her request for conversion in 1989, the decision to deny renewal of her contract in the spring of 1990, and the decision not to consider her renewed request for conversion in the fall of 1990 were in effect simply affirmations of the Department's vote in 1988 to deny Saunders conversion.

---

**75.** D.C.Code § 1–2525(a) provides in full:

It shall be an unlawful discriminatory practice for any person to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise of any right granted or protected under this chapter.

With respect to the decision not to renew Saunders' contract, this argument is not persuasive. It is one thing to decide that an individual does not deserve a promotion. It is quite another to determine that the individual should be let go. Moreover, the rationales offered for not renewing Saunders' contract differed from those offered for denying her request for conversion in 1988. *Compare supra* 859, 861 *with supra* 862. As a consequence, a reasonably jury could conclude that the spring, 1990, decision not to renew Saunders' contract was more than a mere affirmation of the Department's earlier decisions.

A reasonable jury could likewise conclude in 1989 that the Department did not simply affirm its earlier denial of Saunders' request for conversion. Although the same members of the Department voted against Saunders in 1989 as in 1988, after Saunders filed this action in September, 1989, members of the Department leveled serious charges of academic misconduct against her, and there is evidence upon which a reasonable jury could conclude that these charges were brought in retaliation for filing this suit. *See supra* 862. A reasonable jury could disbelieve Burns' assertion that she inadvertently stumbled on the so-called discrepancies in Saunders' resume, particularly in light of what it could find to be her later deception of the University's equal employment opportunity officer. *See supra* 860–861. Likewise, such a jury could conclude that the misconduct charges were unprecedented, unfounded, unfairly made, and brought maliciously. Thus, there is more than ample evidence from which a reasonable jury could infer that Smith, Boswell, and Burns retaliated against Saunders for filing this suit.

Furthermore, there is also evidence that another member of the Department retaliated against Saunders. In an affidavit, Dr. Greenberg swears that Dr. Moore told him that "I would have voted for [Saunders] if she hadn't sued us for racial discrimination." Greenberg Affidavit ¶ 11. GWU contends that this statement is hearsay and, therefore, inadmissible. Under the Federal Rules of Evidence, however, a "statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by the party's agent or servant concerning a matter within the scope of the agency or employment made during the existence of the relationship ..." Fed. R.Evid. 802(d)(2). It is undisputed that Moore is and was an employee of GWU and that consideration of Saunders' requests for conversion and promotion was within the scope of her duties as a tenured member of the Department. It would therefore appear plain that Moore's statement is admissible as the admission of a party opponent. *Cf. Staheli v. University of Mississippi*, 854 F.2d 121, 127 (5th Cir.1988). GWU's reference to the Supreme Court's discussion of the work-for-hire doctrine in *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166, 2172, 104 S.Ct. 811 (1989) in any way undermines the plain meaning of this Rule.

In the alternative, GWU urges that Dr. Moore's statement be excluded under Rule 403 because "Saunders' calculated decision not to depose Dr. Moore ... renders Dr. Moore's alleged statement so unreliable that it is substantially more prejudicial than probative...." Defendant's Supplemental Memorandum at 5. GWU does not, however, explain why it has failed to present an affidavit or depose Dr. Moore. More importantly, its argument lacks any legal basis. It is the jury's function to weigh the credibility of evidence. *See Western Industries, Inc. v. NewCor Canada Ltd.*, 739 F.2d 1198, 1202 (7th Cir.1984); *Bowden v. McKenna*, 600 F.2d 282, 284–85 (1st Cir.), *cert. denied*, 444 U.S. 899, 100 S.Ct. 208, 62 L.Ed.2d 135 (1979) (footnote and citations omitted); 22 C. Wright & K. Graham, *Federal Practice & Procedure: Evidence* § 5214, at 265–66 (1978). Furthermore, GWU has failed to indicate any prejudice. It only points to the potentially devastating effect that Greenberg's testimony might have upon its case—which shows that the evidence is highly probative, not that it is prejudicial.

GWU's arguments are more persuasive with respect to Saunders' September 1990 request for conversion. That request was not rejected due to any newly coined criti-

cism of Saunders. It was rejected because Vice–President French felt that the University had already decided to terminate its relationship with Saunders. *See* Letter from Roderick S. French to Dr. Deloris M. Saunders, October 5, 1990. French, however, added apparently as an alternative ground that President Trachtenberg had instituted a moratorium on conversions. *See id.* He earlier had informed Smith that departments were making such recommendations despite the moratorium and that such requests were merely being added to the existing inventory. *See* Memorandum from Roderick S. French to George W. Smith, November 30, 1989. A reasonable jury could conclude the French altered his position with this litigation in mind.

In conclusion, although Saunders has failed to state any claims for retaliation under § 1981, she has raised a genuine issue as to all of her claims for retaliation under the D.C. Human Rights Act Statute.

## VI.

Assuming that Saunders' § 1981 claims would be dismissed, GWU urged the Court to decline jurisdiction over any remaining claims under the D.C. Human Rights Statute. Because, however, Saunders § 1981 claims remain and because the remaining state claims are intertwined with those federal claims, pendant jurisdiction over the state claims should be retained. *See generally United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

## VII.

For the reasons stated above, an Order of June 20, 1991 granted GWU's motion for summary judgment with respect to her claims under § 1981 for failure to renew her contract and for retaliation. As to all of Saunders' other claims, however, the Order denied GWU's motion.