**Paul P. PAQUIN, Plaintiff,**

v.

**FEDERAL NATIONAL MORTGAGE ASSOCIATION, Defendant.**

Civil Action No. 94–1261 SSH.

United States District Court, District of Columbia.

July 31, 1996.

---

**28**

Christopher G. Mackaronis, Timothy W. Seaver, Bell, Boyd & Lloyd, Washington, DC, for Plaintiff.

Brad Risinger, Bruce L. Montgomery, Kenneth I. Juster, Steven G. Reade, Arnold & Porter, Washington, DC, for Defendant.

*OPINION*

STANLEY S. HARRIS, District Judge.

Before the Court are defendant's motion for summary judgment, plaintiff's opposition, defendant's reply and plaintiff's surreply. Upon careful consideration of the record, defendant's motion for summary judgment is granted on all claims. Although "[f]indings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56," Fed.R.Civ.P. 52(a), the Court nonetheless sets forth its reasoning.

*BACKGROUND FACTS*

Plaintiff, a 52–year–old male, began his employment as a management consultant with defendant, Federal National Mortgage Association ("Fannie Mae"), in January 1972. Defendant Fannie Mae is a federally chartered corporation, created to provide affordable mortgage financing for home-buyers and renters, and is the country's largest supplier of home mortgage funds. The Investor Relations department assists senior management and the Office of the Chairman in formulating and delivering the company's message to current and potential investors. The department works with other parts of the company to devise a comprehensive strategy addressing the needs and concerns of outside investors and analysts, and to communicate that message to the investment community. Plaintiff assisted in the development of Fannie Mae's Investor Relations department in 1976, serving as manager, vice president and then Senior Vice President for Investor Relations until his dismissal in 1994.

Although both sides agree that in the past plaintiff contributed significantly to the success of Fannie Mae's Investor Relations program, there are several areas in which his superiors repeatedly expressed dissatisfaction with plaintiff's performance in his capacity as senior vice president. While plaintiff's superiors consistently recognized plaintiff's achievements and skill with outside investors and analysts, they just as consistently complained of his inability to effectively communicate and interact within the company, noting his shortcomings with respect to the internal aspect of his job.

Plaintiff reported directly to J. Timothy Howard, Fannie Mae's Executive Vice President and Chief Financial Officer. Howard prepared plaintiff's annual performance evaluations and met with him biweekly to discuss the evaluations and plaintiff's subsequent progress. In 1991, while acknowledging plaintiff's external accomplishments, Howard enumerated a number of instances in which internal management performance was unsatisfactory, citing inadequate review of junior staff work, lack of communication on important issues, untimely completion of major

tasks, and insufficient participation in the preparation of presentations, and noting that "Paul needs to ensure that department administration is performed to a much higher standard next year." Pl.'s Opp., Ex. 5. In his 1992 evaluation of plaintiff, Howard underscored plaintiff's need to improve internal departmental operations, pointing out repeated major errors, lack of creativity in investor presentations, and inadequate insight into investor preferences and valuation processes. He documented specific mishaps as well as plaintiff's general inability to view specific projects as part of a comprehensive strategy reflecting the company's long-term plans. When the necessary improvements were not observed during the following year, Howard's 1993 evaluation again referenced plaintiff's internal management problems and areas of concern, noting plaintiff's failure to produce work that was "well thought out, solidly researched, thoroughly analyzed, and internally consistent with other current and past work or statements." Pl.'s Opp., Ex. 13. At his deposition, plaintiff denied that the evaluations disapproved of his work, challenging the validity of the evaluations and characterizing the comments as "pure constructive criticism on how I would improve my response to the internal demands, not that I was doing an unsatisfactory job." Paquin Dep. at 163.

Plaintiff's consistently negative evaluations led the company's leadership to question his judgment and ultimately to consider terminating his employment with Fannie Mae. At a compensation committee meeting in November 1992, the committee members discussed Howard's assessment of plaintiff's performance, and at the 1993 meeting they suggested he be terminated due to his substandard performance. Although plaintiff was not terminated at that time, it was evident that his evaluations reflected a general dissatisfaction among upper management with his work. Senior management perceived him as "somebody who had no strategic sense about the positioning of the company, somebody who was completely unable to express himself in writing, someone whose advice and judgment was uneven in quality, and somebody who generally was not an outstanding performer." Johnson Dep. at 13. Senior management was especially disappointed with specific projects for which plaintiff was responsible, such as Fannie Mae's 1993 Investor/Analyst Biennial Conference. Company officials noted plaintiff's disorganization and lateness in preparation, the inadequacy of audio-visual supplements, and his weakness in serving as the "emcee of the conference." Raines Dep. at 76. Plaintiff's employers also complained of misjudgment on issues of policy, failure in speech writing, and indiscretion in referring pejoratively to his direct superiors.

Serious consideration of plaintiff's continued employment with Fannie Mae began in late 1993. The Chairman's office devised options whereby plaintiff could amicably leave Fannie Mae the following year, and the decision to terminate him was reached by the end of the year. The Vice Chairman, Frank Raines, and the Senior Vice President for Administration, Doug Bibby, informed plaintiff of the decision on February 14, 1994; on that day, plaintiff wrote in his calendar, "Frank Raines and Doug Bibby inform me that I'm through with Fannie Mae!!!" Paquin Dep., Ex. 5. At the February 14 meeting, plaintiff was offered a separation package, which was later amended to include an additional $5,000 for legal fees and an extended deadline.[1] On March 1, plaintiff informed Fannie Mae that he believed his termination was unlawfully based on his age, and demanded a larger separation package in exchange for a release from legal liability under the Age Discrimination in Employment Act ("ADEA"). 29 U.S.C. § 621 *et seq.* (1988 & Supp.1995). Defendants declined to make any further accommodations, and when the amended package was not accepted by March 16, it was withdrawn and plaintiff's employment was officially terminated.

On March 17, 1994, plaintiff filed a charge for unlawful termination and retaliation with the Equal Employment Opportunity Commission ("EEOC"), and subsequently filed

---

1. The deadline was extended to March 16 in an effort to accommodate the requests and negotiations that were taking place.

this suit on June 8, 1994. Count I alleges termination of employment based on age under the ADEA, Count II alleges unlawful retaliation under the ADEA, Count III alleges age discrimination under the District of Columbia Human Rights Act, and Count IV alleges unlawful retaliation under District of Columbia law.

*ANALYSIS*

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether summary judgment is appropriate, all evidence and inferences must be construed in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If a reasonable jury could return a verdict for the non-moving party based on the record, summary judgment may not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Differences of opinion on details not directly relevant to the legal issue at hand are not sufficient to preclude summary judgment—the non-moving party must present issues of *genuine* material fact in the context of the present case. *Harding v. Gray*, 9 F.3d 150, 154 (D.C.Cir.1993).

**A. *The Unlawful Termination Claim***

Plaintiff has brought suit under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the District of Columbia Human Rights Act ("DCHRA"), D.C.Code Ann. § 1–2525 (1992). In the absence of direct evidence of age discrimination, courts have generally applied the test for Title VII racial and gender discrimination, derived from the *McDonnell–Douglas* case, which established a three-part, burden-shifting standard by which to determine discrimination. *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Initially, a plaintiff must establish a *prima facie* case of age discrimination. The burden then shifts to the defendant employer to demonstrate a legitimate, non-discriminatory reason for plaintiff's termination. In order to prevail, plaintiff must then prove that defendant's stated reason is actually a pretext for discrimination. *McDonnell–Douglas*, 411 U.S. at 801–07, 93 S.Ct. at 1824–26 (1973); *see also Hayman v. National Academy of Sciences*, 23 F.3d 535, 538 (D.C.Cir.1994); *Csicseri v. Bowsher*, 862 F.Supp. 547, 568 (D.D.C.1994), *aff'd without opinion*, 67 F.3d 972 (D.C.Cir.1995).[2] The *McDonnell–Douglas* test has become the accepted means by which age discrimination is determined, and questions of material fact are relevant only as they relate to the three stages of the test.

*1. The Prima Facie Case*

In order to demonstrate a *prima facie* case of age discrimination, plaintiff must show that he (i) belongs to the protected age group; (ii) was qualified for the position; (iii) was terminated; and (iv) was replaced by a younger person.[3] *Coburn v. Pan American World Airways, Inc.*, 711 F.2d 339, 342 (D.C.Cir.1983) (citing *Cuddy v. Carmen*, 694 F.2d 853, 857 (D.C.Cir.1982)); *Hayman*, 23

---

**2.** District of Columbia law pursuant to the District of Columbia Human Rights Act concurs with federal law, consistently employing and affirming the *McDonnell–Douglas* three-part test. *See Perkins v. District of Columbia*, 769 F.Supp. 11, 14, n. 3 (D.D.C.1991); *Saunders v. George Washington University*, 768 F.Supp. 854 (D.D.C. 1991); *Alder v. Columbia Historical Society*, 690 F.Supp. 9 (D.D.C.1988); *Howard University v. Green*, 652 A.2d 41, 45 (D.C.1994); *O'Donnell v. Associated General Contractors of America*, 645 A.2d 1084, 1086 (D.C.1994); *Benefits Communication Corp. v. Klieforth*, 642 A.2d 1299, 1301 (D.C.1994).

**3.** Defendant suggests that plaintiff's replacement must be outside the statutorily protected class. Def.Mot. for Summ.J. at 8. The Supreme Court held in April in *O'Connor v. Consolidated Coin Caterers Corp.*, however, that the ADEA does not require the replacement to be under 40 years old, and that she need only be substantially younger than plaintiff at the time of his termination. *O'Connor v. Consolidated Coin Caterers Corp.*, —— U.S. ——, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996).

F.3d at 537; *O'Donnell v. Associated General Contractors of America,* 645 A.2d 1084, 1087 (D.C.1994) (applying the standard with respect to District of Columbia law).

■ Plaintiff in this case was 50 years old at the time of his termination, and was replaced by a 40–year–old woman. The only potential challenge to plaintiffs *prima facie* case goes to whether he was in fact qualified for his high level position at Fannie Mae. Conflicting evaluations of his work could conceivably create a question of material fact regarding his qualifications as senior vice president of Investor Relations. Plaintiff's burden at this stage of the analysis, however, is minimal. *Jackson v. Lyons Falls Pulp and Paper, Inc.,* 865 F.Supp. 87, 95 (N.D.N.Y.1994). Plaintiff worked at Fannie Mae for 22 years, holding successive management positions and progressing consistently upward within the company. Based on his professional background it is presumed that, although recent problems and inadequacies led Fannie Mae to terminate his employment, plaintiff possessed the basic skills for his position, and was sufficiently qualified to satisfy the *prima facie* burden.

### 2. Defendant's Legitimate, Non-discriminatory Reason for Termination

■ Fannie Mae was not satisfied with plaintiff's work. There is no issue of material fact with respect to upper management's opinion of plaintiff and his performance as senior vice president of his department. The record manifests a long-standing, well-documented dissatisfaction with plaintiff's work, reflected in contemporaneous accounts of his progress and of the problems he encountered.

The legal standard for employment discrimination has consistently been based on the employer's perception of the plaintiffs work. *Smith v. Chamber of Commerce of the United States,* 645 F.Supp. 604, 608 (D.D.C. 1986). Praise from other sources is not relevant, and while aspects of plaintiff's performance may be praised by outside investors and by plaintiff himself, the conflict between these evaluations and those of the company does not render Fannie Mae's perceptions somehow suspect. As long as an employer's expectations are known and reasonable, they govern an employee's evaluation and the standards for his termination. *Kerwood v. Mortgage Bankers Association of America, Inc.,* 494 F.Supp. 1298, 1309 (D.D.C.1980). Plaintiff knew that his superiors at Fannie Mae considered internal relations to be a major component of his job, a component that they did not believe he adequately executed. Three successive performance evaluations as well as regular meetings with his supervisor identified and characterized the problem. Plaintiff chose not to question or challenge the evaluations, continuing without regard to Fannie Mae's clearly delineated criticism of his work.

■ Fannie Mae's opinion of plaintiff was legitimate and reasonable given the circumstances. The fact that he was concededly talented in the external aspect of his work does not preclude shortcomings in internal matters, and inadequacy in one area sufficiently justifies his termination. *Kerwood,* 494 F.Supp. at 1298 (plaintiff was extremely qualified in one respect, but his problems in management and administration warranted his termination). A court should focus on the specific quality the employer found lacking, determining whether the evaluation of that area was legitimate. As long as the employer's rationale is genuine, there is no reason to examine other elements of plaintiff's work. *Ezold v. Wolf, Block, Schorr and Solis–Cohen,* 983 F.2d 509 (3d Cir.1992), *cert. denied,* 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1995). *See also Menard v. First Sec. Servs. Corp.,* 848 F.2d 281, 286 (1st Cir.1988).

Plaintiff cites praise and support from his superiors at different times during his career at Fannie Mae, contending that the changing quality of his reviews "delegitimizes" the recent condemnation of his work, and serves as a guise for underlying discrimination. Mixed reviews of the employee over time do not affect the validity of the ultimate evaluation. The Court must consider reviews from the time of the termination, as earlier positive evaluations do not necessarily reflect the employee's current abilities or qualifications. *Karazanos v. Navistar International Transportation Corp.,* 948 F.2d 332, 336 (7th Cir. 1980); *Smith,* 645 F.Supp. at 607. An indi-

vidual's skills can change over time, and evolving circumstances can alter the nature of a job, demanding different skills and new approaches. Plaintiff assisted in the original creation and development of the Investor Relations department, and his original responsibilities were primarily external—namely, bolstering Fannie Mae's standing and reputation in the investment community. As time progressed, however, Investor Relations became an integral part of the company and plaintiff was promoted to senior management. He accordingly became more deeply involved in the operations of Fannie Mae, and the changing circumstances required him to focus more seriously on the internal aspect of his job. It is thus intuitive that past praise may no longer be relevant, and prior evaluations may not accurately reflect his current abilities given Fannie Mae's current requirements.

■ Plaintiff has submitted exhibits detailing his own assessment of his performance at Fannie Mae in an effort to create a question of material fact regarding the caliber of his work with the company. Plaintiff's own opinion of his performance is not relevant, however, to Fannie Mae's decision to terminate his employment. As long as there is no discrimination, "it is the perception of the decision-maker, rather than the employee, which is relevant." *Buttell v. American Podiatric Medical Association*, 700 F.Supp. 592, 596 (D.D.C.1988). *See also Smith*, 645 F.Supp. at 608. Plaintiff claims that the pages and pages of Annual Incentive Plan ("AIP") performance appraisals and activity reports that he wrote and submitted to Howard create an issue of material fact regarding his ability as senior vice president. Plaintiff's praise of his own work does not negate Fannie Mae's opinion, and it is clear that the decision-makers in this case unequivocally and legitimately believed that plaintiff was not sufficiently competent in his position.

Plaintiff's skill is best judged by his direct superiors at Fannie Mae—those most familiar with his work, who fully understood the situation and could best appraise the quality of his performance on a daily basis. *Menard*, 848 F.2d at 286; *Kephart v. Institute of Gas Technology*, 630 F.2d 1217, 1219 (7th

Cir.1980), *cert. denied*, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981); *Smith*, 645 F.Supp. at 608. Investors and business associates who witnessed only plaintiffs external efforts could not appreciate the requirements of Fannie Mae's internal management operations. While their praise was flattering and perhaps useful in other contexts, plaintiffs supporters could not judge his performance in a manner that is relevant to the issue at hand. Even if plaintiff's relations with outside analysts and investors had been extraordinary, his internal inadequacies and Fannie Mae's dissatisfaction with plaintiff in that regard remain unchallenged.

Fannie Mae's employment decision was motivated solely by internal personnel considerations, and the Court is not in a position to judge the wisdom of a company's business decisions. "The law fully recognizes the employer's business necessity to make its employee judgments free from restraint." *Kerwood*, 494 F.Supp. at 1309. In the absence of actionable discrimination, Fannie Mae may conduct business as it wishes, making choices that a court may believe to be inappropriate or wrong. Courts judge only the legality, not the prudence, of a company's decisions. *See Huhn v. Koehring Co.*, 718 F.2d 239, 243 (7th Cir.1983); *Kephart*, 630 F.2d at 1223; *Long v. First Family Financial Services, Inc. of Georgia*, 677 F.Supp 1226, 1229 (S.D.Ga.1987). Perhaps Fannie Mae misjudged plaintiff, inaccurately criticizing his performance. It is conceivable that plaintiff excelled in all areas of Investor Relations, and that his termination was a loss to the department and the company. Though Fannie Mae would suffer in such a case, this Court may not police its internal actions, and without evidence of discrimination, this Court cannot condemn the rationale underlying a legitimate employment decision.

*3. Was Fannie Mae's Reason a Pretext for Discrimination?*

■ With respect to the third phase of the *McDonnell–Douglas* test, the courts are divided between two distinct standards governing plaintiff's effort to show that defendant's asserted nondiscriminatory rationale was a pretext for discrimination. Plaintiff

contends that he need only discredit Fannie Mae's basis for his termination, and need not show further affirmative evidence of discrimination beyond his *prima facie* case. *See Waldron v. SL Industries,* 56 F.3d 491, 495 (3rd Cir.1995); *Durham v. Xerox Corp.,* 18 F.3d 836, 839–40 (10th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 80, 130 L.Ed.2d 33 (1994); *Gaworski v. ITT Commercial Finance Corp.,* 17 F.3d 1104, 1110 (8th Cir. 1994); *Anderson v. Baxter,* 13 F.3d 1120, 1124 (7th Cir.1994); *Mitchell v. Data General Corp.,* 12 F.3d 1310, 1315 (4th Cir.1993); *Washington v. Garrett,* 10 F.3d 1421, 1433 (9th Cir.1993); *Hairston v. Gainesville Sun Publ. Co.,* 9 F.3d 913, 921 (11th Cir.1993). Other courts have held that because plaintiff bears the ultimate burden of proof throughout the process, he must offer additional, affirmative evidence of discrimination in order to demonstrate pretext. Thus, even if the employer's rationale were clearly illegitimate, plaintiff would have to prove that discrimination was more likely the cause of termination than the employer's stated justification. *See Bodenheimer v. PPG Industries, Inc.,* 5 F.3d 955, 957 (5th Cir.1994); *LeBlanc v. Great American Insurance Co.,* 6 F.3d 836 (1st Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1398, 128 L.Ed.2d 72; *Saulpaugh v. Monroe Community Hospital,* 4 F.3d 134, 142 (2d Cir.1993); *United Planning Organization v. District of Columbia Commission on Human Rights,* 530 A.2d 674 (D.C.1987). Some courts, including those in the District of Columbia court system, have employed an "either-or" form of the test, considering either method of proof sufficient to demonstrate pretext. *United Planning Organization v. District of Columbia Commission on Human Rights,* 530 A.2d 674, 677 (D.C.1987); *RAP Inc. v. District of Columbia Commission on Human Rights,* 485 A.2d 173, 177 (D.C.1984). Plaintiff's various scenarios of age discrimination both fail to provide additional evidence of discrimination and insufficiently discredit Fannie Mae's legitimate reason for termination, and plaintiff thus does not satisfy either test for establishing pretext.

Plaintiff argues initially that his termination was based on negative stereotypes of older workers, by which employers perceive older individuals as less creative, stubborn and resistant to change. Pl.'s Opp., Ex. No. 23. The article plaintiff relies on, however, does not contemplate the current case, and there is no direct application of the authors' general assertions to plaintiff's termination. Plaintiff also cites a number of cases that allegedly indicate that criticism of an employee's inflexibility or creativity is "likely to be pretextual as they are so easily stated about older workers." *Mitchell v. Data General Corp.,* 12 F.3d 1310, 1317 (4th Cir.1993), and necessarily constitutes age discrimination. *See also Hazen Paper Co. v. Biggins,* 507 U.S. 604, 609–11, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993); *Visser v. Packer Engineering Associates, Inc.,* 924 F.2d 655, 658 (7th Cir.1991); *Buttell v. American Podiatric Medical Association,* 700 F.Supp. 592, 596 (D.D.C.1988). While they indirectly consider the purpose of the ADEA and potential discrimination, these cases do not suggest that any specific words or phrases specifically constitute age discrimination. Plaintiff must show not only that age stereotypes exist in the abstract, but that Fannie Mae's dissatisfaction was a veil for discrimination, and that the stereotypes specifically motivated plaintiff's termination.

Creativity and responsiveness are integral aspects of upper management, and plaintiff's performance as senior vice president necessarily required some degree of these traits. When a questionable characteristic is essential for the proper performance of a job, it may be required, regardless of its ties to age in other contexts. *Mitchell,* 12 F.3d at 1318. Plaintiff's theoretical discussion of age stereotypes does not demonstrate that the isolated, vague references to creativity and flexibility in the present case actually reflect a discriminatory attitude or outlook based on age or that such an attitude caused plaintiff's termination. "The only response offered . . . is the conclusory characterization that the description of his nonperformance is consistent with stereotypical comments about older workers. Such conclusory allegations fail to create a factual dispute." *Id.*

The idea that Fannie Mae's rationale for terminating plaintiff was a pretext for anything is further undermined by the fact that

plaintiff's problems in these areas existed long before plaintiff reached the threshold age protected by the ADEA. Former CEO David Maxwell complained of plaintiff's stubbornness and internal deficiencies in the mid–1980's, and the company had intended to terminate him at that time. Maxwell Dep. at 52–62. Plaintiff suggests that Maxwell consistently supported his work, and that his present criticism merely underscores the pretext argument. Pl.'s Opp. at 38. While Maxwell recognized plaintiff's external success with the company, nothing in the record indicates that Maxwell thought his internal work was commendable at any point in time. Maxwell's simultaneous praise of one aspect of plaintiff's work and criticism of another is consistent with plaintiff's varying record throughout his career at Fannie Mae. Plaintiff's behavior exceeded Fannie Mae's tolerance level when he was 50 years old, but no interpretation suggests that the company's criticisms were newly created as a pretext for age discrimination.

[redacted] Plaintiff alternatively attempts to establish pretext based on his replacement by Elizabeth Snyder, a younger, allegedly less qualified individual. While replacement by a younger person is necessary for plaintiff's *prima facie* case, it does not, in and of itself, challenge Fannie Mae's legitimate reason for termination, and does not automatically imply discrimination. *O'Connor v. Consolidated Coin Caterers Corp.*, —— U.S. ——, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). While Snyder has less experience in investor relations, her record reflects extensive experience in the corporate world and in Fannie Mae, and her employment in this capacity serves to directly remedy the aspects of plaintiff's performance that Fannie Mae found unsatisfactory. Pl.'s Opp., Ex. 14. Demographic trends and the nature of the labor market make it likely that most people who leave a corporation, for any reason, will be replaced by someone younger for entirely legitimate reasons. *Kephart v. Institute of Gas Technology,* 630 F.2d 1217, 1224 (7th Cir.1980), *cert denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981); *McCoy v. WGN Television,* 758 F.Supp. 1231, 1237 (N.D.Ill. 1990). In replacing a high level executive, management will naturally explore other parts of the company, considering employees with related, lower-level experience who are, based on the corporate structure and hierarchy, younger than those who have served extensively in senior level positions. Most importantly, Snyder was not considered for the position until after Fannie Mae had decided to terminate plaintiff, and her selection thus could not have been part of a greater, discriminatory scheme. Raines Dep. at 24. Snyder's philosophy and style filled precisely the internal void that plaintiff's shortcomings had created, and her age was merely incidental to the substantive, qualitative concerns at issue.

The analysis that defeats plaintiff's age discrimination claim under the ADEA accordingly overcomes his DCHRA claims as well, since the legal standards governing both are the same. *See supra* note 2. Defendant's motion for summary judgment on both age discrimination claims is therefore granted.

### *B. The Retaliation Claim*

Plaintiff offers two explanations of his retaliation claim. Though the parties confuse the claims and arguments, the Court considers all evidence and inferences in a light most favorable to the non-moving party for purposes of summary judgment, and thus accepts plaintiff's analysis of retaliation as the one in question. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., supra; White v. Fraternal Order of Police,* 909 F.2d 512, 516 (D.C.Cir.1990). Neither of plaintiff's interpretations, however, sufficiently proves retaliation, and no genuine question of material fact exists with regard to the claim.

[redacted] Retaliation requires that (i) plaintiff is engaged in a protected activity; (ii) there is some adverse impact on the plaintiff; and (iii) the adverse impact is causally related to the exercise of the protected activity. *Passer v. American Chem. Soc.,* 935 F.2d 322, 331 (D.C.Cir.1991); *Thorne v. Alexander,* 782 F.Supp. 677, 680 (D.D.C.1992); *Saunders v. George Washington University,*

768 F.Supp. 854, 868 (D.D.C.1991).[4] The uncontested facts demonstrate that, based on the legal standards of retaliation, plaintiff's claims are not valid.

### 1. The First Scenario: March 1 Comments Induced Withdrawal of Separation Package

 Plaintiff's first scenario suggests that the source of retaliation was the expression of his belief on March 1 that his termination was motivated by age discrimination, and that Fannie Mae retaliated by withdrawing the separation package that had originally been offered and refusing further negotiations. Pl.'s Br. at 41, Pl.'s Opp., Ex. 41. Initially, it seems unlikely that plaintiff's comments were the genuine cause of the accused retaliation. In his March 17 filing with the EEOC, Pl.'s Opp., Ex. 46, retaliation is alleged in response to plaintiff's refusal to sign a waiver of legal responsibility, and he did not mention the March 1 comments. While the complaint filed in this court does introduce the March 1 comments, it is unclear why the course of events were not fully explained in the EEOC charge, and the comments thus do not seem to be the actual source of retaliation.

Assuming the March 1 comments were in fact the cause of retaliation, such conduct does not constitute protected activity under the ADEA. The Act prohibits retaliation because the individual "has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this Act." 29 U.S.C. § 623(d). The Act was designed to prevent retaliation against active opposition to discriminatory practices, not against general discussion and informal comments on the matter. Such circumstances would allow a retaliation claim based on any

isolated remark even remotely related to discrimination, placing an enormous burden on employers to avoid "retaliating" against an employee due to some vague comments regarding discrimination. Such an interpretation would also allow an employee to make unsubstantiated allegations of discrimination and then sue for "retaliation" if any ·perceivedly adverse employer action was taken following the allegation. Related cases reflect a tendency to exclude similar actions from the protection of § 623(d). Courts have generally implied that in order to implicate the retaliation clause of the ADEA, some official action with respect to litigation or investigation must actually have been initiated. *Glass v. IDS Fin. Servs., Inc.,* 778 F.Supp. 1029, 1060 (D.Minn.1991). Cases question what action constitutes the opposition that § 623(d) requires, finding, for instance, that refusal to sign a waiver of legal responsibility does not constitute an act "opposing" discrimination as the Act intended. *EEOC v. Sears, Roebuck & Co.,* 857 F.Supp. 1233, 1239 (N.D.Ill.1994) "This is not actionable discrimination because Sears' conduct was not precipitated by the type of affirmative conduct implied by the phrase 'oppos[ing] an unlawful practice.'" *See also Jackson v. Lyons Falls Pulp and Paper,* 865 F.Supp. 87 (N.D.N.Y.1994). Courts presume that the opposition necessary to prove retaliation involves active and direct challenge to the company's alleged discriminatory action that exceeds an indefinite, unofficial expression of suspected age bias.

 Even if the Court assumes that plaintiff's comments on March 1, 1994, constituted protected activity under the ADEA, plaintiff has not shown any "adverse action" resulting therefrom. The withdrawal of separation benefits is not an "adverse action," and is thus not an actionable form of "retaliation." Fannie Mae's official policy does not include an assurance of severance pay upon

---

**4.** Again, District of Columbia law in the context of the DCHRA employs the same standard for retaliation as federal law under the ADEA, and thus arguments with respect to the ADEA claim also apply to the DCHRA claim. *Goos v. National Association of Realtors,* 715 F.Supp. 2, 3 (D.D.C.1989); *Schoen v. Consumers United Group, Inc.,* 670 F.Supp. 367, 374 (D.D.C.1986);

*Thompson v. International Association of Machinists and Aerospace Workers,* 614 F.Supp. 1002, 1012 (D.D.C.1985); *Howard v. Green,* 652 A.2d 41, 45 (D.C.1994); *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 368 (D.C.1993); *Lyles v. District of Columbia Department of Employment Services,* 572 A.2d 81, 82–3 (D.C.1990).

departure from the company. Pl.'s Opp., Ex. 3. If severance pay is contractually required, it cannot be applied unequally, but if a separation package constitutes an additional benefit that was not specifically guaranteed, it may be negotiated, waived, or refused. *EEOC v. Sears*, 857 F.Supp. at 1240. Plaintiff contends that although Fannie Mae does not guarantee a separation package, it is the company's general practice to provide one, and the refusal to provide it constitutes an "adverse action" against him. Fannie Mae did, in fact, provide plaintiff with several different separation options. They were flexible in their efforts to satisfy plaintiff, offering additional money for attorney's fees and extending the deadline for accepting the package beyond the original cutoff date. When the final package was not accepted by the deadline provided, Fannie Mae withdrew the offer.[5] The accepted practice of severance pay applies only in the context of good faith negotiation on both sides, and plaintiff systematically rejected each of Fannie Mae's efforts to devise a fair and reasonable separation package. In such a case, severance pay is a privilege, not a right, and refusal to provide a separation package does not imply adverse action or retaliation as intended by the statute. *Jackson*, 865 F.Supp. at 95.

#### 2. The Second Scenario: Filing the EEOC Claim Caused Plaintiff's Termination

 Plaintiff's second retaliation charge asserts that his March 17, 1994, filing of an age discrimination claim with the EEOC provoked Fannie Mae to terminate him. Pl.'s Br. at 44; Pl.'s Opp., Ex. 41. Filing a complaint with the EEOC falls within the terms of § 623(d) of the ADEA. Such a claim represents an official measure that formally opposes alleged discrimination, and is the type of active step the statute was designed to protect. However, the standards for retaliation demand not only that protected activity occur and adverse action be taken, but that the adverse action be causally related to the exercise of protected activity. In order to prove Fannie Mae's retaliation in this respect, plaintiff's termination must have

been directly caused by the filing of the EEOC claim. The chronology of the record, however, makes this impossible, as plaintiff was officially terminated before any formal or informal discussion of discrimination arose.

Plaintiff was terminated on February 14, 1994. Plaintiff argues that at that time, no date was specified for his departure and that he was permitted to continue his duties indefinitely, and that he thus had not yet been terminated. Pl.'s Opp. at 42. In the February 14 meeting, Senior Vice President for Administration, Doug Bibby, and Vice Chairman, Frank Raines, told plaintiff that they were going to "make a change in the leadership of investor relations and that his employment would end with Fannie Mae." Bibby Dep. at 192. Plaintiff was given a separation agreement to consider on February 14 and the notation in his calendar on that day shows that he understood the situation and was aware of the implication—that he was "through" with Fannie Mae. Paquin Dep., Ex. 5. While plaintiff was not immediately compelled to cease work or leave his office, and the company was flexible regarding the terms of his departure, the Office of the Chairman had clearly resolved to end his employment at Fannie Mae. The decision-making process that took place in the last months of 1993 was completed by late December or early January, Raines Dep. at 21, and plaintiff was apprised of his termination on February 14. Raines Dep. at 11. In such cases, the alleged retaliatory act is the decision itself, and retaliation occurs when the decision to terminate is reached. *Kuemmerlein v. Madison Metro. School Dist.*, 894 F.2d 257, 260 (7th Cir.1990); *McCoy v. WGN Television*, 758 F.Supp. 1231, 1238 (N.D.Ill.1990); *Stephenson v. Martin Marietta*, No. CIV. A. 87–2390, 1988 WL 75736, at *4 (D.Md. Sept. 21, 1988). Discrimination occurs at the time of the discriminatory act, when the actual decision to terminate is made, not when the consequences become most painful and plaintiff finally leaves his duties. *McCoy*, 758 F.Supp. at 1238.

---

5. It is unclear whether plaintiff's attorney actively rejected the offer or merely gave no acceptance by March 16. In either case, however, there is no question that the deadline had passed and no package was agreed upon.

For termination to act as retaliation, Fannie Mae must have decided to terminate plaintiff after he filed his claim with the EEOC. A response to protected activity cannot occur unless the protected activity has already been initiated. *Glass v. IDS Fin. Servs., Inc.*, 778 F.Supp. 1029, 1060 (D.Minn. 1991). The EEOC claim was not filed until March 17. Pl.'s Opp., Ex. 46. Termination had occurred more than a month earlier. On February 14, plaintiff did not mention discrimination and had never expressed the opinion that Fannie Mae's criticism was based on his age. His termination was not in retaliation against protected activity—no protected activity had yet occurred when the termination decision was made. Plaintiff was terminated because he was unable or unwilling to properly perform his duties as senior vice president, and upper management was legitimately dissatisfied with his work.

Neither of plaintiff's retaliation scenarios creates questions of genuine material fact on the basis of which summary judgment may be denied. While ambiguities inevitably exist as to the precise course of events, they are unimportant in this context. Based on the legal standards of retaliation controlling both the ADEA and the DCHRA, there is neither protected activity nor adverse action in the first claim, and the second charge lacks a causal relation between the protected activity and the adverse action. Regardless of how it might resolve the conflicting factual issues, no reasonable jury could find retaliation in either allegation, and summary judgment is therefore granted.

## CONCLUSION

Accordingly, for the foregoing reasons, defendant's motion for summary judgment is granted on all Counts.